**N.A.R., S.p.A., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 88–06–00401.**

United States Court of
International Trade.

June 26, 1990.

Siegel, Mandell & Davidson, Brian S. Goldstein and Judith M. Barzilay; of counsel: David Newman, New York City, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Elizabeth C. Seastrum, Washington, D.C., and Velta A. Melnbrencis, New York City, of counsel: Diane McDevitt, Washington, D.C., Atty.-Advisor, Intern. Trade Admin., U.S. Dept. of Commerce, for defendant.

## OPINION

TSOUCALAS, Judge:

Plaintiff, N.A.R., S.p.A. ("NAR"), brings this action pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (1988), to contest the final results of an antidumping duty administrative review covering pressure sensitive plastic tape from Italy. The ITA determined therein that an antidumping margin of 6.39 percent existed on NAR's sales of the tape in the United States.[1] The basis for the Court's jurisdiction is 28 U.S.C. § 1581(c) (1988).

### Background

NAR is an Italian manufacturer and exporter of pressure sensitive plastic tape to the United States. The ITA's review covers plastic tape manufactured by NAR which entered the United States between October 1, 1985 and September 30, 1986. On October 1, 1986, NAR requested that the ITA conduct an administrative review of an outstanding antidumping duty order for that period.

Before issuing its preliminary determination, the ITA, on November 18, 1986, sent

---

1. The fourth administrative review of Commerce's antidumping duty order was published in the Federal Register on May 9, 1988. *Pressure Sensitive Plastic Tape From Italy; Final* *Results of Antidumping Duty Administrative Review and Revocation in Part,* 53 Fed.Reg. 16,444 (May 9, 1988).

out a questionnaire requesting that NAR indicate, within 45 days, whether any differences existed between the types of merchandise sold in the home market (Italy) or to third countries, and the merchandise sold in the United States. Further, the ITA requested that NAR acknowledge any differences between the cost of manufacturing the merchandise sold in the home market and the cost of manufacturing the merchandise sold in the United States. NAR responded on February 18, 1987, but did not address the question of cost differences. The ITA requested again that NAR provide cost differences, or explain why no cost differences were provided.

NAR's subsequent response noted that "the only difference in the product sold in the home market and the product sold in the U.S. market is the size of the rolls." *NAR Deficiency Response* (July 23, 1987) in *Administrative Record, Public Reel* (*"Public Reel"*) at 125. The rolls of tape sold in Italy come in sizes of 66 meters (short) and 990 meters (long), whereas in the United States a short roll is 50 meters and a long roll is 914 meters. NAR again did not specify any cost differences and claimed that this was because their accounting techniques did not provide for such distinctions. *Id.*

The ITA subsequently released the preliminary results of this administrative review. *Pressure Sensitive Plastic Tape From Italy; Preliminary Results of Antidumping Duty Administrative Review and Intent to Revoke in Part,* 53 Fed.Reg. 550 (Jan. 8, 1988). A margin of 2.06 percent was found to exist on NAR's sales of pressure sensitive plastic tape in the United States. *Id.* However, no adjustments were made for cost differences in the manufacture of the differently sized rolls, and the ITA excluded from their calculations all rolls of tape less than 50 meters, the size of the short rolls sold in the U.S. Additionally, in making this computation, the ITA used indirect selling expenses in the U.S. to offset commissions paid in the home market.

Petitioner, Minnesota Mining and Manufacturing Company ("3M"), filed comments based on these results. 3M contended that the ITA's failure to make cost adjustments for differently sized tape rolls distorted the dumping margin in NAR's favor, since the longer tape sold in Italy was cheaper to produce on a per square meter basis than the shorter tape sold in the U.S. The difference is attributable to a cost difference per square meter in the "core cost" and the "slitting cost." As the same size core is used regardless of how much tape is wound around it, the cost declines as the length of the roll increases. The slitting cost is the cost of cutting the tape to a particular length. Slitting cost differences are related to additional labor and variable overhead costs as a result of the need for more slitting, resulting in higher costs incurred, to produce the shorter rolls. *3M Comments* (Sept. 14, 1987) in *Public Reel* at 156.

The ITA, in its final determination, chose to make adjustments for these physical differences. 53 Fed. Reg 16,444. A new margin of 6.39 percent was found in NAR's U.S. sales. The increase was attributed to differences found in the cost figures of another Italian tape manufacturer, Manuli, which were used as best information available to adjust for the physical differences.

Plaintiff now contests these results on three major grounds. First, NAR asserts that the increased margin is a result of the ITA's acceptance of 3M's comments, which NAR suggests are not supported by substantial evidence in the administrative record, or otherwise not in accordance with law. NAR questions the need to make cost adjustments for differences in the physical characteristics of the merchandise. Alternatively, if the Court finds there is such a need, NAR questions the use of another manufacturer's cost data as best information available. But, if the use of another manufacturer's cost data is held to be appropriate, NAR asserts that the ITA should have used that manufacturer's most comparable product in making antidumping calculations.

Second, NAR believes the ITA acted unreasonably in excluding from their calculations tape rolls sold in the home market

which were shorter than 50 meters, because this unfairly increased the dumping margin to their disadvantage. Finally, NAR contends that the dumping margin was further increased improperly to their disadvantage by the ITA's use of indirect selling expenses in the U.S. market to offset commissions paid in the home market.

### Discussion

The antidumping laws of the United States are "directed to foreign products that are sold in the United States at less than fair value." *Asociacion Colombiana de Exportadores de Flores v. United States,* 901 F.2d 1089, 1091 (Fed.Cir.1990); *Smith–Corona Group v. United States,* 713 F.2d 1568 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). In reaching a determination that sales in the U.S. were at less than fair value, the ITA compares the price of goods in the U.S. with their foreign market value.

■ This Court may review a final antidumping determination by the ITA to ascertain whether its findings were made in conformity with the law. An antidumping determination will be overturned only if it is not supported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988); *Gold Star Co. v. United States,* 12 CIT ——, ——, 692 F.Supp. 1382, 1383 (1988), *aff'd,* 873 F.2d 1427 (Fed.Cir.1989). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at ——, 692 F.Supp. at 1383–84; *see Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984)). The Court, however, may not substitute its judgment for that of the ITA. *SCM Corp. v. United States,* 4 CIT 7, 10, 544 F.Supp. 194, 197 (1982). Hence, deference is given to the expertise of the administrative agency regarding factual findings. With these principles in mind, the Court now addresses the specific assertions made by plaintiff.

### Cost Adjustments for Physical Differences

NAR first argues that the ITA should not have made cost adjustments for the physical differences between the tape sold in the home market (Italy) and the tape sold in the United States. *Plaintiff's Memorandum in Support of Motion for Judgment upon an Agency Record ("Plaintiff's Memorandum")* at 11.

■ If the price at which goods are sold in the United States is less than their foreign market value, the difference between the two is the dumping margin and antidumping duties must be paid to offset it. 19 U.S.C. § 1673 (1988); *Ansaldo Componenti, S.R.A. v. United States,* 10 CIT 28, 35, 628 F.Supp. 198, 204 (1986). The regulations promulgated by the Secretary state that when comparing the home market selling price with the U.S. selling price for the purpose of determining whether antidumping duties shall be assessed, "due allowance shall be made for differences in the physical characteristics of the merchandise in the markets being compared." 19 C.F.R. § 353.16 (1988). The physical differences are most relevant inasmuch as they are related to differences in costs of production, so long as the ITA is satisfied that "any price differential is wholly or partly due to such differences," though the effect of the differences on market value is also to be considered. *Id.* The reason for these adjustments for physical differences is "to obtain a fair comparison of prices at which identical or similar merchandise is sold in two different markets, at the same point in a chain of commerce, and under similar commercial conditions." *U.H.F.C. Co. v. United States,* 13 CIT ——, ——, 706 F.Supp. 914, 920 (1989).

The merchandise at issue is pressure sensitive plastic tape. The ITA, in its questionnaire dated November 6, 1986, requested that NAR "identify the most similar types of merchandise that you sell domestically," if the merchandise sold in the United States is physically different from the domestically sold product. *ITA Questionnaire* (Nov. 6, 1986) in *Public Reel* at 34. Furthermore, NAR was instructed to sub-

mit "cost difference[s] attributable to each physical difference." *Id.* The questionnaire specifically explained that NAR must "provide two separate lists quantifying the cost differences between the home market comparison tapes and the tapes that [were] exported to the United States." *Id.* at 35.

NAR's response stated that the company "produces two similar products for packaging in the sizes under investigation." *NAR Questionnaire Response* (Feb. 4, 1987) in *Public Reel* at 90.[2] It went on to distinguish the two tapes based on weight and color, adding "[n]ot to distort the purpose of the antidumping review, it is essential that for the comparison Commerce follows the classes of colours we have indicated." *Id.* at 91. The ITA, however, did not accept these distinctions. Hence, in its deficiency letter of July 2, 1987, the ITA again asked which tape sold by NAR in its home market was most similar to the tape sold in the U.S. *ITA Deficiency Letter* in *Public Reel* at 122. Once more, the ITA asked for "the difference in the cost of manufacturing ... between the U.S. and home market tapes." *Id.*

NAR's response reiterated its prior statement that it made only two different tapes: the tape with PVC film and the tape with PP film, both of which are sold in both markets. *NAR Deficiency Response* (July 23, 1987) in *Public Reel* at 125. However, NAR acknowledged that there was a difference between the tape sold in the U.S. and the tape sold in the home market; that is, the difference in the length of the rolls. *Id.* The short roll sold in the U.S. contains 50 meters of tape, while the short roll sold in the home market (Italy) holds 66 meters. The long roll sold in the U.S. holds 914 meters, while in the home market the long roll is 990 meters. *Id.* Nonetheless, NAR indicated that there were no real physical differences between the products sold in the home market and in the U.S., and thus there was no reason to make cost adjustments.

However, the ITA rejected NAR's proposed groupings by classes of colors in the third administrative review. 51 Fed.Reg. 43,955 (Dec. 5, 1986). In its petition, 3M urged that the ITA should again reject these grouping because the only way to "test N.A.R.'s questionable position that no difference-in-merchandise adjustments are necessary" is to obtain, analyze and verify NAR's production costs for both the home market and U.S. tapes. *Id.* NAR's response was to criticize Commerce's groupings as "creat[ing] distortions adverse to NAR," and to urge Commerce "to adopt the product groupings advanced by NAR." *NAR Letter* (Oct. 20, 1987) in *Public Reel* at 181–82.

The ITA decided not to make cost adjustments in its preliminary findings. But 3M, in its subsequent comments, stated that the difference in the size of the rolls did constitute a physical difference and did relate to costs of production. *3M Comments* (Feb. 16, 1988) in *Public Reel* at 221–22. In its petition, 3M charged that the 66 meter and 990 meter tapes made for the home market were cheaper to produce than the 50 meter and 914 meter tapes made for the U.S. market. *Id.* 3M attributed this cost differential to the fact that the same size core is used "regardless of how much tape is wound around it." *Id.* at 221. Also, petitioner stated that the slitting cost per square meter is greater for the shorter rolls because of greater labor and factory overhead costs.

Therefore, "a dumping comparison between shorter U.S. tape and longer home market tape, absent ... adjustments, is distorted in the exporter's favor, and dumping margins are thereby reduced or eliminated." *Id.* Consequently, 3M argued, there is a need to adjust the cost of the rolls destined for export to reflect differences in physical characteristics which caused the cost differences.

NAR, in its response to the preliminary results and in supplemental comments, remained reticent on the issue of cost adjustments. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon an Agency Record ("Defen-*

---

**2.** The two products listed were pressure sensitive tape with PVC film, and pressure sensitive tape with POLYPROPYLENE (PP) film. *Questionnaire Response* in *Public Reel* at 90.

*dant's Memorandum"*) at 6.[3] Since NAR did not provide the requested cost information on its production of tape rolls, the ITA resorted to using the best information available ("BIA").

### Best Information Available

The ITA is authorized expressly by 19 U.S.C. § 1677e to use best information if it is "unable to verify the accuracy of the information submitted," or if a party under investigation "refuses. or is unable to produce information requested in a timely manner and in the form required." 19 U.S.C. § 1677e(b) and (c) (1988); *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556 (Fed.Cir.1984); *Uddeholm Corp. v. United States,* 11 CIT 969, 676 F.Supp. 1234 (1987).

NAR maintains that it could not produce the data requested by the ITA because its accounting techniques do not tabulate costs on the basis of the lengths of the rolls. *Plaintiff's Memorandum* at 12. In its questionnaire response of February 4, 1987, NAR sought to steer the ITA's antidumping investigation away from production costs grouped by length of rolls and toward costs grouped by "classes of colours," the way its internal accounting is done. *Id.* at 91. NAR now accuses the ITA of improperly using best information available as a means of "penaliz[ing] NAR for the way in which it kept its production cost records." *Plaintiff's Memorandum* at 12.

■ It is for the ITA to conduct its antidumping investigations the way it sees fit, not the way an interested party seeks to have it conducted. The ITA's use of best information available has been upheld where a party tried to direct the ITA's investigation. *Pistachio Group of the Ass'n of Food Indus., Inc. v. United States,* 11 CIT 668, 671 F.Supp. 31 (1987). In such a case, the best information rule may be used to prevent a respondent from controlling the results of an antidumping investigation "by selectively providing the ITA with information." *Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1572 (Fed.Cir.1990).

■ Similarly, if a party does not produce the information *as requested,* the ITA is entitled to invoke 19 U.S.C. § 1677e and use best information available. This Court has consistently confirmed the ITA's authority to use best information available when parties are unwilling or unable to produce information in a timely manner and *in the form requested,* in order "to facilitate timely completion of administrative proceedings." *Tai Yang Metal Indus. Co. v. United States,* 13 CIT ——, ——, 712 F.Supp. 973, 977 (1989). *See also Ansaldo Componenti,* 10 CIT 28, 628 F.Supp. 198. In fact, the best information rule has been compared to an investigative tool which the ITA may use to prod into action "recalcitrant parties ... whose failure to cooperate may work against their best interest." *Atlantic Sugar,* 744 F.2d at 1560.

■ In the present action, NAR submitted cost information as it recorded it, that is, based on "classes of colours." *NAR Questionnaire Response* (Feb. 4, 1987) in *Public Reel* at 90–91. The ITA thereafter specifically requested information on cost differences between the tape sold in the home market and the tape sold in the U.S. *ITA Deficiency Letter* in *Public Reel* at 122. NAR never provided answers to this particular request.

NAR states that it "neither refused nor was unable to produce [the] information requested." *Plaintiff's Memorandum* at 14. Yet in the same paragraph NAR concedes that "the form of [its] submissions was based upon *NAR's* record keeping and ordinary accounting principles." *Id.* (emphasis added). Commerce's regulations expressly state that best information available will be used if information "is not submitted in a timely fashion or *in the form required."* 19 C.F.R. § 353.51(b) (1988) (emphasis added). Hence, it is not sufficient that NAR provided cost informa-

---

**3.** 3M's comments contain a certificate of service indicating that a·copy of the comments was mailed to NAR. *Public Reel* at 226. Hence,

NAR had notice of 3M's comments concerning the cost adjustments for physical differences.

tion according to its internal procedures if those procedures did not produce what the ITA specifically requested.

Seeing that NAR could not or would not provide the details in the form required, the ITA was justified in seeking to obtain the data it wanted and had requested repeatedly and precisely, based on the best available information.[4] Therefore, the ITA's use of best information available was in accordance with law and is supported by substantial evidence in the record.[5]

### Use of Another Manufacturer's Cost Data as BIA

■ NAR next argues that, even if the ITA's use of best information was appropriate, its use of another manufacturer's cost data was not. When use of best information is challenged, the question is not whether the ITA has chosen the "best" of all available information, but rather whether the information chosen by the ITA is supported by substantial evidence on the record. *Chinsung Indus. Co. v. United States*, 13 CIT ——, ——, 705 F.Supp. 598, 601 (1989). Otherwise, the administrative process would be frustrated and the burden of creating an adequate record would shift from respondents to the ITA. *Id.* The Court must uphold ITA's use of best information available if the use of that data is supported by substantial evidence in the record and otherwise in accordance with law.

The information the ITA may use as best information includes "all information that is accessible or may be obtained, whatever its source." *Timken Co. v. United States*, 11 CIT 786, 788, 673 F.Supp. 495, 500 (1987) (citing *Budd Co. v. United States*, 1 CIT 67, 75, 507 F.Supp. 997, 1003–04 (1980)). This encompasses "the information submitted in support of the petition." 19 C.F.R. § 353.51(b). Furthermore, best information available "is not necessarily accurate information, it is information which becomes usable because a respondent has failed to provide accurate information." *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT ——, ——, 704 F.Supp. 1114, 1126 (1989), *aff'd*, 901 F.2d 1089 (Fed.Cir.1990).

■ The information that the ITA relied on as best information available was "another firm's publicly available cost data on merchandise differences for the last review period." 53 Fed.Reg. 16,444. That firm, Manuli Autoadesivi S.p.A. ("Manuli"), manufactures a tape for sale in Italy, which the ITA claims is similar to the tape made by NAR. NAR, however, asserts that the Manuli tape used by the ITA was not Manuli's most comparable product, and therefore, the cost figures for that tape should not have been used as best information available.

The ITA used Manuli 316 Stampato tape as a substitute for NAR's tape so as to garner best information available as to cost differences between U.S. and home market tapes. Manuli exported a number of tapes, but the ITA chose the one with the highest cost differences. According to Commerce, since

> N.A.R. had failed to provide Commerce with any of its relevant [cost] data, and there were a myriad of possibilities involving N.A.R.'s actual production costs for the different length tapes, Commerce chose the highest cost difference reported by Manuli in the third administrative

---

**4.** Unlike the situation in *Olympic Adhesives,* plaintiff here did not "provide complete answers to the questions presented in an information request." *Olympic Adhesives,* 899 F.2d at 1574. The information requested repeatedly and specifically by ITA was the cost differential between the tape rolls made for the home market and the tape rolls made for the U.S. market. Since NAR did not provide this information, its answers were not complete.

**5.** NAR distinguishes its conduct from that of plaintiff in *Ansaldo Componenti, supra,* suggest-

ing that use of best information is not proper unless plaintiff's conduct is consistently "unresponsive, insufficient, and untimely" and "conspicuously uncooperative." *Ansaldo Componenti,* 10 CIT at 36, 628 F.Supp. at 205. However, the best information rule was never meant to be used only against the most obtrusive offenders. The statute and accompanying regulations explicitly indicate that the best information rule is to be used when a party does not answer the ITA's questions. 19 U.S.C. § 1677e; 19 C.F.R. § 353.51.

review as best information available and adjusted the foreign market value accordingly for N.A.R.'s tapes.

*Defendant's Memorandum* at 21.

Commerce adds that the information upon which it may rely as best information available is "that information in which Commerce has 'reasonable and justified confidence' and which is reasonably accessible given the time constraints of an antidumping investigation." *Id.* at 21–22 (citing *Porcelain-on-Steel Cooking Ware from Taiwan; Final Determination of Sales at Less Than Fair Value,* 51 Fed. Reg. 36,425, 36,427 (Oct. 10, 1986)). Commerce claims that without any information on cost differences from NAR, it could not reasonably rely on Manuli's lower cost differentials as being indicative of NAR's actual cost differences. *Id.* at 22.

NAR professes that the Manuli tape chosen by the ITA is "completely different" from NAR's tape sold in the U.S. during the review period and therefore should not form the basis for best information available. *Plaintiff's Memorandum* at 15. According to NAR, what makes the tapes so different is that the Manuli tape is a *printed* tape whereas the NAR tape is not printed. Hence, the Manuli tape "has an additional printing process in its production making its production more expensive." *Id.* In essence, NAR is arguing that "the difference reported by Manuli had to do solely with the difference in *printing costs* from U.S. to home market." *Id.* at 16 (emphasis in original). NAR further insists that Manuli's submissions prove that the cost differences for that particular tape "are greater by far than those between any other type of tape reported." *Id.*

If the cost differences in Manuli's tape sold in the U.S. and home market indeed are due solely to varied printing costs, rather than just differences in per square meter costs generally, then NAR would be justified in disputing the use of Manuli's 316 Stampato tape data. Since NAR's tape sold in the U.S. at that time was not printed, its cost differences may well have been different from Manuli's. While the Court finds the difference in the size of the rolls does constitute sufficient basis for Commerce to make cost adjustments, the Court is not convinced that Commerce's confidence in the Manuli data as best information available was "reasonable and justified" given the potential for significant differences in printing costs.

Therefore, the Court remands this issue to the ITA so that the agency may explain its reasons for choosing Manuli's printed tape as best information available, rather than a tape which is similar to the tape NAR sold in the U.S. during the review period. Furthermore, Commerce is instructed to determine the basis for the cost differences in Manuli's home market tape versus the tape sold in the U.S. Lastly, Commerce is directed to use another tape's cost figures as best information available if it determines that the printing costs created greater cost differences than there would have been if there were no printing costs.

### Such or Similar Merchandise

NAR also contends that the ITA, in its calculation of foreign market value, should have included sales of *"all* sizes of pressure sensitive plastic tape sold in the home market including those rolls shorter than 50 meters." *Plaintiff's Memorandum* at 22 (emphasis in original). NAR claims that these shorter rolls are "such or similar merchandise" as defined in 19 U.S.C. § 1677(16), and therefore should have been included in the investigation.[6]

---

**6.** 19 U.S.C. § 1677(16) defines such or similar merchandise as

   (A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

   (B) Merchandise—
      (i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,
      (ii) like that merchandise. in component material or materials and in the purposes for which used, and

Exclusion of the shorter rolls, NAR argues, caused the foreign market value to be calculated improperly.

Commerce counters that the Court should not even reach this issue because the ITA's decision to exclude sales of the shorter rolls "was made early on in the administrative proceeding and was well-documented in the administrative record." *Defendant's Memorandum* at 23. Since NAR "never questioned this action during the administrative proceeding," Commerce claims that NAR "failed to exhaust its administrative remedies" regarding this issue and thus it is not ripe for judicial review. *Id.*

### Exhaustion of Remedies

In *LMI–LA Metalli Industriale, S.p.A. v. United States*, 13 CIT ——, 712 F.Supp. 959 (1989), *appeal docketed*, No. 89–1532 (Fed.Cir. June 16, 1989), the Court held that exhaustion of administrative remedies is generally required before a litigant may raise a claim in a civil action. 13 CIT at ——, 712 F.Supp. at 968; *see also* 28 U.S.C. § 2637(d) (1988); *Sharp Corp. v. United States*, 837 F.2d 1058, 1062 (Fed.Cir.1988). Exceptions to the exhaustion doctrine in non-classification cases do exist, and thus application of the doctrine must be determined on a case by case basis. *Alhambra Foundry Co. v. United States*, 12 CIT ——, ——, 685 F.Supp. 1252, 1256 (1988); *Timken Co. v. United States*, 10 CIT 86, 93, 630 F.Supp. 1327, 1334 (1986).

Exceptions have been found where the requirement of exhaustion "would be futile or an insistence on a useless formality." *Alhambra*, 12 CIT at ——, 685 F.Supp. at 1256. Also, the Court has waived the condition where to pursue an administrative resolution "could not lead to relief" or would yield "manifestly inadequate reme-

dies." *Id.* (citations omitted).[7] The Court has also recognized an exception "where Commerce did not adhere to controlling judicial precedents" and where a party's arguments were based on facts in the confidential record and the party was not informed of the deadline for access to the record. *Id.* (citing *Philipp Bros., Inc. v. United States*, 10 CIT 76, 78, 630 F.Supp. 1317, 1320 (1986)).

In light of this case law, the Court must determine if the exhaustion doctrine bars plaintiff from raising this issue. The ITA selects product groupings for model match comparisons of such or similar merchandise based on one of the criteria in 19 U.S.C. § 1677(16). The computer printout regarding the ITA's preliminary results, dated December 30, 1987, indicates that certain home market sales were excluded from these groupings. *Preliminary Results Computer Printout* (Dec. 30, 1987) in *Non–Public Reel* at 513–514. Among the excluded items were numbers 1570–1581, which were not assigned a group number. *Id.* at 514. NAR's computer printout of sales data indicates that those numbers correspond to sales of tape less than 50 meters long. *NAR Sales Data Printout* in *Non–Pubic Reel* at 291. Further, Commerce has shown that the product groupings were not changed "in any way for purposes of its final results for this administrative review." *Defendant's Memorandum* at 24.

Consequently, NAR was aware, or should have been aware that the ITA had decided to exclude tape rolls shorter than 50 meters when it reviewed the printout. Thus NAR should have voiced its objections during this period. NAR asserts that the ITA "obscured its model match decision ... [and that] plaintiff did not become aware that tape less than 50 meters had been excluded until after the publication of

---

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

**7.** However, the Court has interpreted the "manifestly inadequate" standard narrowly. Thus, "mere allegations of financial harm, or assertions that an agency failed to follow a statute, do not make the remedy established by Congress manifestly inadequate." *Alhambra*, 12 CIT at ——, 685 F.Supp. at 1256.

the final results of the review." *Plaintiff's Reply to Defendant's Memorandum in Opposition ("Plaintiff's Reply")* at 6.[8] The computer printouts make clear which tape rolls were included in the product groupings, and a careful reading of them would have alerted NAR to the exclusion of the shorter rolls.

NAR had an opportunity to raise this issue before Commerce during the administrative proceedings and did not. Additionally, NAR has not asserted any of the exceptions to the doctrine mentioned above, and since this Court will not *sua sponte* search the record to see if any of the exceptions apply, the Court must apply the doctrine and bar plaintiff from now contesting Commerce's product groupings on this ground. For the Court to act otherwise would be to "usurp the agency's function ... and deprive the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946). *See also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *Wieland Werke, AG v. United States*, 13 CIT ——, ——, 718 F.Supp. 50, 55 (1989); *LMI*, 13 CIT at ——, 712 F.Supp. at 968; *Kokusai Elec. Co. v. United States*, 10 CIT 166, 173, 632 F.Supp. 23, 29 (1986).

### Indirect Selling Expenses

■ Lastly, NAR contests Commerce's decision to use indirect selling expenses to offset home market commissions paid by NAR. In the home market, NAR employed the services of independent selling agents to whom commissions were paid. NAR then used the commissions as a downward adjustment on foreign market value pursuant to 19 U.S.C. § 1677b(a)(4)(B) (1988). That section calls for the ITA to make an adjustment of foreign market value if there are "differences in circumstances of sale" between the U.S. and the home market.

An adjustment was made for the home market commissions pursuant to 19 U.S.C. § 1677b(a)(4)(B). However, no commissions were paid in connection with sales in the United States. Hence, the ITA calculated indirect selling expenses on sales to the U.S. as an offset to deductions for commissions in the home market. NAR objects to this offset because it "eliminated a valid circumstance of sales adjustment ... for a direct selling expense, home market commissions." *Id.*

In determining foreign market value, the ITA shall make due allowance for differences in circumstances of sale between the U.S. price and the foreign market value. 19 U.S.C. § 1677b(a)(4)(B). The regulations interpreting the statute state that, in comparing the U.S. price with the foreign market value, "reasonable allowances will be made for bona fide differences in the circumstances of the sales." 19 C.F.R. § 353.15(a) (1988). Such differences, however, generally are limited "to those circumstances which bear a direct relationship to the sales which are under consideration." *Id.*

Notwithstanding this standard, the regulation entitled "Special Rule" allows for adjustments for other selling expenses

> where a reasonable allowance is made for commissions in one of the markets under consideration and no commission is paid in the other market under consideration, the amount of such allowance being limited to the actual other selling expenses incurred in the one market, or the total amount of the commission allowed in such other market, whichever is less. In making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses in-

---

**8.** NAR states that handwritten notes it received from Commerce during the post-preliminary result disclosure conference indicate that tape rolls less than 50 meters *were* included in the model match groupings. *Plaintiff's Reply* at 7–8. For plaintiff to have based its belief that the shorter rolls were within model match be- cause of this notation would have been both unreasonable and imprudent. Hence, the Court finds this evidence insufficient to support plaintiff's contention that the case be remanded so that Commerce may include the shorter rolls in its price comparisons.

curred in the home market up to the amount of the selling expenses incurred in the United States market.

19 C.F.R. § 353.15(c) (1988). It is undisputed that during the review period, NAR paid commissions in the home market but not in the U.S. Therefore, Commerce used the commissions to adjust the foreign market value downward for differences in circumstances of sale pursuant to statute. Then Commerce used NAR's indirect selling expenses in the U.S. to offset the commissions adjustment. *Defendant's Memorandum* at 27.

NAR claims that the ITA should not have used indirect selling expenses in the U.S. to offset the home market commissions because the statute and regulations limit the use of the offset to determinations where the U.S. price is based on exporter's sale price ("ESP"), while in this case the U.S. price is based on purchase price. *Plaintiff's Memorandum* at 24. NAR contends this action by Commerce "artificially inflat[ed] the antidumping margins." *Id.* at 25.

However, in *NAR, S.p.A. v. United States*, this Court made a distinction between the first part of the regulation and the second. 13 CIT at ——, 707 F.Supp. 553, 559 (1989). The first part of the "Special Rule" calls for an adjustment to be made for selling expenses where commissions are paid in one market but not the other. That adjustment is limited to "the *lesser* of either the amount of commissions paid or the amount of indirect selling expenses incurred in the market not associated with the commissions." 13 CIT at ——, 707 F.Supp. at 559 (emphasis in original).

The second part of the regulation limits the allowance to be made for all actual selling expenses in the home market to the amount of selling expenses in the U.S. market. *Id.* It is this second part of the regulation only which is limited to comparisons using ESP. Since in the present action the comparison was made to purchase price and not ESP, this part is inapplicable.[9] Accordingly, Commerce's decision to use the indirect selling expenses in the U.S. to offset commissions paid in the home market is reasonable and in accordance with law and is, therefore, sustained.

### Conclusion

The determination by the Department of Commerce is accordingly affirmed in part and remanded to the ITA so that the ITA may further investigate the issue of cost adjustments and its choice of another manufacturer's cost data as best information available in conformity with this opinion.

### JUDGMENT

This case having been duly submitted for judgment upon the agency record following the finding by the International Trade Administration (ITA) of a dumping margin of 6.39 percent in *Pressure Sensitive Plastic Tape From Italy; Final Results of Antidumping Duty Administrative Review and Revocation in Part*, 53 Fed.Reg. 16,-444 (May 9, 1988), it is hereby

ORDERED that the determination of the ITA to use another manufacturer's cost data as best information available is remanded to the ITA. The ITA is directed to:

(1) explain its reasons for choosing a printed tape whose cost data was used as best information available pursuant to 19 U.S.C. § 1677e when the tape in issue was not a printed tape; and

(2) determine the basis for the cost differences in the tape sold in the home market as opposed to the tape sold in the United States; and

---

**9.** NAR cites *Rhone Poulenc, S.A. v. United States* for the proposition that the offset applies only "where dumping margins are determined by comparing the foreign market value with the exporter's sales price as opposed to the purchase price in the United States." 8 CIT 47, 68, 592 F.Supp. 1318, 1336 (1984). Since in the present action the foreign market value is being compared to the purchase price and not ESP, NAR argues that indirect selling expenses should not be used to offset home market commissions. *Plaintiff's Memorandum* at 28. But in *Rhone Poulenc*, the Court explained that the "relevant part" of the regulation for its purposes was the second part, which is indeed expressly limited to cases involving ESP comparisons. 8 CIT at 68, 592 F.Supp. at 1336. Since that is not the case in the instant action, the reasoning there is impertinent here.

(3) use another tape's cost data as best information available if it determines that the original tape's printing costs caused greater cost differences than there would have been if there were no printing costs; and

(4) report the results of such remand determination to this Court within 30 days from the date hereof.  It is further

ORDERED that the balance of the ITA's final determination is affirmed in all respects: