**ROYAL THAI GOVERNMENT and TTU Industrial Corp., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Court No. 92–03–00175.
Slip Op. 94–59.

United States Court of International Trade.

April 7, 1994.

Willkie Farr & Gallagher, Kenneth J. Pierce and Daniel L. Porter, Washington, DC, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Michelle Behaylo, Attorney–Advisor, Office of the Chief Counsel for Import Admin., Dept. of Commerce, Michael S. Kane, Atty., Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

NEWMAN, Senior Judge:

Plaintiffs, the Royal Thai Government ("RTG") and TTU Industrial Corp., brought this action to challenge the final results of the administrative review in *Carbon Steel Butt–Weld Pipe Fittings from Thailand: Final Results of Countervailing Duty Review*, 57 Fed.Reg. 5,248 (February 13, 1992) ("*Butt–Weld Review*"). This court previously held that the determination of the International Trade Administration of the Department of Commerce ("Commerce") was unsupported by substantial evidence on the record and remanded the case to Commerce to supplement the record with missing documentation and provide further explanation for Commerce's selection of a new country-wide benchmark for short-term financing, based upon the evidence and analysis contained in the record of *Steel Wire Rope from Thailand*, 56 Fed.Reg. 46,299 (September 11, 1991), in which Commerce initially selected the new benchmark. The court's prior decision is reported at *Royal Thai Government v. United States*, 17 CIT ——, 824 F.Supp. 1089 (1993), familiarity with which is presumed.

On August 6, 1993, Commerce issued its *Final Results of Redetermination Pursuant to Court Remand*, ("*Remand Results*"), which plaintiffs now contest. The court holds that Commerce's new benchmark methodology is reasonable and that Commerce's determination in *Butt–Weld Review*,

as further explained in the *Remand Results*, is supported by substantial evidence on the record.

This action was commenced under 19 U.S.C. § 1516a(a)(2)(B)(iii). Exclusive jurisdiction is conferred upon the court by 28 U.S.C. § 1581(c).

## BACKGROUND

This matter involves an administrative review by Commerce of a countervailing duty order pursuant to section 751(a) of the Tariff Act of 1930, 19 U.S.C. § 1675(a). The order followed the final results of a countervailing duty investigation in *Carbon Steel Butt–Weld Pipe Fittings from Thailand*, 55 Fed.Reg. 1,695 (January 18, 1990), in which Commerce determined that the RTG's Export Packing Credits program ("EPC") constituted a subsidy that provided to exporters low interest, short-term loans at preferential rates.[1]

In its investigations, Commerce quantifies the benefit of a countervailable interest rate subsidy by comparing the rate for the subsidized to a "benchmark" rate. The benchmark rate theoretically reflects the interest rates that a Thai exporter would otherwise have incurred by obtaining loans through private channels, i.e., in the absence of the subsidized program. Commerce constructs the benchmark interest rate from the interest rates available for alternative sources of financing in the country in question. *See Proposed Regulations*, 54 Fed.Reg. 23,366, 23,369 (May 31, 1989).[2]

The section of the *Proposed Regulations* relating to benchmark selection, § 355.-44(b)(3), provides, in relevant part:

> (3)(i) In the case of a short term loan provided by a government, the Secretary will use as a benchmark the average interest rate for an alternative source of short-term financing in the country in question. In determining this benchmark, the Secre-

---

**1.** According to the verification report in the *Butt–Weld Review*, exporters applying for EPC's must submit documents relating to their export transaction to their commercial bank. Once the EPC loan is approved, the exporter issues a promissory note to the commercial bank. The commercial bank thereupon endorses the note and forwards it to the Bank of Thailand, which refinances 50 percent of the loan at a rate of four

percent for agricultural exports and five percent for manufactured goods.

**2.** The standards expressed in the *Proposed Regulations* have been applied in ITA's countervailing duty investigations in other cases and are not challenged by plaintiffs.

tary normally will rely upon the predominant source of short-term financing in the country in question. *Where there is no single, predominant source of short-term financing, the Secretary may use a benchmark composed of the interest rates for two or more sources of short-term financing in the country in question, weighted, wherever possible, according to the value of financing from each source.*

(ii) For purposes of paragraph (b)(3)(i) of this section, "predominant" means that type of short-term financing the total value of which is greater than or equal to 50 percent of the total value of short-term financing, in local currency, in the relevant country.

54 Fed.Reg. at 23,380 (emphasis added). Since there is no single predominant source of short-term financing in Thailand, Commerce has in the past relied upon a benchmark that was calculated as the weighted average of the rates charged on domestic loans, bills and overdrafts. ("RTG benchmark"). The underlying statistical information for this benchmark was supplied by Thai commercial banks to the Bank of Thailand ("BOT"), which thereupon applied a complex formula in arriving at the benchmark.

Plaintiffs do not dispute that EPC's are subsidized. Rather, plaintiffs take issue with Commerce's decision to discontinue its prior reliance on the RTG benchmark and adopt a new methodology which has resulted in a higher benchmark, and hence, a higher rate of subsidy. Plaintiffs argue that Commerce's decision to reject the RTG benchmark in favor of the new benchmark methodology is unsupported by substantial evidence. It is further argued that the new methodology is not in compliance with the *Proposed Regulations.*

In the RTG benchmark formula, BOT divided actual interest paid during a given period on short-term commercial loans by the corresponding principal amount on the relevant loans. The resulting percentage became the benchmark. Specifically, BOT started with a numerator which encompasses all interest charged on bills, loans and overdrafts in Thailand. BOT then deducted from that numerator the interest paid on loans

that it considered to be atypical of short-term borrowing, such as interbank loans and EPC's. Financial corporation lending was not included in the calculation. Similarly, BOT started with a denominator which constituted the average total of outstanding principal on bills, loans and overdrafts, and then deducted the principal corresponding to the interest deducted from the numerator. The result was a weighted average of interest rates paid on the various forms of comparable alternative sources of short-term financing in the country.

At the request of the United States Butt–Weld Pipe Fittings Committee, Commerce initiated a section 751(a) administrative review of the *Butt–Weld Pipe Order* for the period of November 3, 1989 through December 31, 1990. 56 Fed.Reg. 6,621 (February 19, 1991). During the investigation in *Butt–Weld Review,* which forms the basis for the instant action, the agency was engaged in another countervailing duty investigation into subsidies to the steel wire rope industry in Thailand. *See Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Steel Wire Rope from Thailand,* 56 Fed.Reg. 46,299 (September 11, 1991) ("*Steel Wire Rope*"). It was in the context of *Steel Wire Rope,* the final results of which preceded by one month the publication of the preliminary results in the *Butt–Weld Review,* that Commerce discontinued its reliance upon the RTG benchmark. Initially, the agency was dissatisfied with alleged computational errors on the part of BOT, and had formed doubts concerning the representativeness of the RTG benchmark in light of rates charged for interbank loans. Moreover, in the course of its on-site verification in *Steel Wire Rope,* Commerce learned from officials at a major commercial bank in Bangkok that most short-term commercial lending was made at the minimum loan and overdraft rates, published in the Bank of Thailand Quarterly Bulletin. The average of the minimum loan and overdraft rates is significantly higher than the RTG benchmark rate reported by BOT. Having determined that the RTG benchmark was unreliable as a measure of short-term commercial financing in Thailand, Commerce selected a new

benchmark, computed as the simple average of the minimum loan rate and the minimum overdraft rate ("MLR/MOR benchmark").

The agency then applied the MLR/MOR benchmark in the *Butt–Weld Review.* Plaintiffs challenged Commerce's preliminary determination on the ground that the RTG's weighted average benchmark accounts for 90 percent of short-term commercial lending in Thailand, whereas overdrafts and loans constitute only 70 percent of such lending. Furthermore, plaintiffs urged that many short-term commercial loans were made at rates below the minimum loan rate published in the BOT Quarterly Bulletin.

In its final results, Commerce's rejection of the RTG benchmark, as well as its subsequent selection of the MLR/MOR benchmark, was not explained in any detail with reference to record evidence, either from *Steel Wire Rope* or based upon the state of the record of *Butt–Weld Review* as it existed at the time.[3] Rather, Commerce applied the new benchmark with a brief cross-reference to *Steel Wire Rope.* This court, therefore, remanded the action to Commerce with instructions to include those portions of the administrative record in *Steel Wire Rope* that were before the agency during the *Butt–Weld Review* and entered into its decision to reject the RTG benchmark, and to explain more fully its selection of the new benchmark in light of plaintiffs' assertions that significant lending took place below the published MLR/MOR rates. *Royal Thai Government, supra,* 824 F.Supp. at 1094. Accordingly, by letter dated July 6, 1993, Commerce informed the court that it had included in the remand record all the relevant documentation from *Steel Wire Rope* that it had considered as part of its determination to reject that RTG benchmark. On August 6, 1993, Commerce issued its remand determination, and reaffirmed its decision to use the MLR/MOR benchmark.

## DISCUSSION

Commerce's determination will be sustained unless its findings are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *N.A.R., S.p.A. v. United States,* 14 CIT 409, 412, 741 F.Supp. 936, 939 (1990). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). It follows that the court may not substitute its judgment for that of the agency when the choice is made between two fairly conflicting views, "even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Thus, in the selection of a country-wide benchmark interest rate, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the Court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–05, 636 F.Supp. 961, 967 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987)).

### I.

Plaintiffs first contend that Commerce's decision to abandon its previous use of the RTG benchmark is without support in the record. Specifically, plaintiffs challenge the following grounds cited by Commerce as reasons for rejecting the RTG benchmark:

    A.  Commerce stated that it could not obtain access to documents provided by Thai commercial banks to BOT, and

---

**3.** None of the documents considered by Commerce in *Steel Wire Rope* in relation to Commerce's selection of the MLR/MOR benchmark had been included by the agency in the administrative record of *Butt–Weld Review.*

upon which BOT constructed composite information later used in the benchmark.

B. Interest calculations for interbank loans were inaccurate because they were based upon the highest monthly rate for interbank loans. Additionally, the RTG benchmark is low in relation to the interbank lending rate, and in fact lower than certain daily interbank rates.

C. Commerce considered the accuracy of the benchmark doubtful in light of the calculations used to deduct EPC loans from the benchmark calculation.

D. The RTG benchmark does not account for lending by financial corporations.

The court will address each such ground *seriatim.*

### A.

Initially, the court observes that BOT was the direct source of information upon which Commerce relied to construct the RTG benchmark. Thai commercial banks filed regular reports with BOT, which thereupon synopsized from those reports monthly data concerning short-term financing activity. BOT then calculated the benchmark in its questionnaire responses to Commerce.

In the *Remand Results,* Commerce explained that it had elected to depart from the RTG benchmark in the *Steel Wire Rope* investigation, in part because the verification team could not obtain the underlying bank reports or other source documentation for the benchmark. *See Remand Results* at 9 (citing Memorandum of Francis Sailer to Eric Garfinkel). However, the report from the verification team in *Steel Wire Rope,* written within one month of on-site verification, contradicts the Garfinkel Memorandum:

The source of the principle [sic] and interest amounts for each of these types of financing was the bank reports filed monthly with the BOT by commercial and other banks. Nine reports are filed periodically by banks, some on a monthly basis and others every six months. Exhibit 9 includes four such reports: the balance sheet, the income statement, interbank

transactions, and total loans classified by type of customer. *Referring to these reports as well as BOT consolidations, we were able to trace the loan principle [sic] and interest figures in response Exhibit 11 to source documents.*

*Steel Wire Rope Verification Report* at 7, Plaintiffs' Exhibit 15 (emphasis added). In the *Remand Results,* Commerce acknowledged the verification report *sub silentio,* saying merely "there is conflicting information in the public record of *Steel Wire Rope* as to whether the verifiers were satisfied that the information they were able to verify adequately supported the benchmark calculation." *Remand Results* at 19. The court agrees with plaintiffs that the above quotation represents nothing more than an attempt to paper over the clear expression on the part of the verification team that the figures underlying the RTG benchmark were duly confirmed and traced back to the documentation provided to BOT by Thai commercial banks.

Commerce seeks to highlight the fact that the verification team in *Butt–Weld Review* traced the underlying figures in BOT's benchmark calculation worksheets to internal worksheets and reports generated by BOT (although it seems that the team did not probe further, i.e., to the source reports of the commercial banks). *See* Memorandum of Donna Kinsella to Barbara Tillman at 2, Plaintiffs' Exhibit 9. Be that as it may, it is the rationale developed in *Steel Wire Rope,* and the underlying evidence, that formed the basis of Commerce's decision to apply the MLR/MOR benchmark in *Butt–Weld Review;* thus, the court is constrained to agree with plaintiffs that, at least as to the verification issue, Commerce's position is without substantial evidentiary support, and is in fact thoroughly contradicted by the record.

### B.

Commerce fares better, however, with regard to its objections concerning the exclusion of interbank loans, and the relation of the RTG benchmark to the rates for interbank lending. The court addresses each such objection in turn.

1. *Deduction of Interbank Loans from the RTG Benchmark.*

In calculating the amount of interest paid on interbank loans during a given period, BOT selected the rate in effect on the last day of each month, which tended to be the highest monthly interbank lending rate, and multiplied it by the outstanding principal amount on such loans. Then, as discussed *supra*, BOT deducted the product of that equation from the numerator of its benchmark equation. Thus, BOT maximized the amount to be deducted from the numerator, effectively pushing the final RTG benchmark rate as far down as possible.

Plaintiffs argue that the higher rate represented by the end-of-month figure is mere "happenstance resulting from the upward tendency of the rates during a period." Reply Brief at 34. The record establishes that in response to a direction by Commerce to BOT to use a weighted average of monthly interbank lending rates in the place of the end-of-month figure, the benchmark rate for 1989 and 1990 rose, if only slightly. Although plaintiffs point out that refinements in the RTG benchmark methodology did not result in a change in the countervailing duty rate, the record shows that BOT's application of interest rates in the benchmark equation did result in inaccuracies, and thereby supports Commerce's decision to seek a new benchmark.

2. *The Relation of Interbank Rates with the Benchmark.*

Commerce further stated that the RTG benchmark could not be representative of short-term commercial lending because the RTG benchmark was unreasonably low in comparison to the interbank rates used in the benchmark calculations. Commerce found the benchmark was lower even than certain daily interbank rates. Interbank loans, it should be recalled, are loans by banks to each other. Commerce took the position, therefore, that a benchmark below the interbank rate would be illogical; banks lending funds below their own cost of money would be committing financial suicide.

Plaintiffs counter that interbank rates are not a significant measure of the representativeness of the benchmark because interbank loans represent a small fraction of the funds from which commercial banks derived their available capital. According to the BOT Second Quarterly Report for 1990, interbank loans accounted for a mere 1.2 percent of the funds available, as compared to, for example, 88.8 percent of funds obtained via deposits. Plaintiffs' Reply Brief at 15. Plaintiffs argue that, because interbank loans account for a small proportion of bank funds, Commerce was necessarily mistaken in its conclusion that the rates charged on those loans were basement rates "below which a commercial bank cannot make loans profitably." Defendant's Brief at 14. As to the issue of whether the RTG benchmark was unreasonably low in relation to interbank rates generally, plaintiffs respond that the small spread between the average interbank rate for 1989 and 1990 and the RTG benchmark for the corresponding period is a function of changes in liquidity and a concomitant decline in interbank borrowing.

Initially, the court observes that the proper comparison to be made is not between the benchmark rate and the isolated instances where the daily interbank lending rate happens to be higher than the benchmark; rather, the more accurate measure is the difference between the weighted average of interbank rates and the benchmark. *See* Plaintiffs' Exhibit 2 and attachment 7. This conclusion is the inevitable result of Commerce's own insistence upon using weighted average rates in deducting interbank loan payments from the numerator of the RTG benchmark. Plaintiffs correctly point out that the average of interbank lending rates was consistently lower than the benchmark for the period under investigation.

Commerce is on stronger ground, however, in faulting the RTG benchmark as being unreasonably low in relation to the average interbank rate. Commerce points out that interbank rates typically represent the most favorable terms obtainable on short-term loans; thus, the selection of a nation-wide benchmark that is not separated by a substantial spread from interbank rates would be counterintuitive because the logical conclusion of such a relative position would be

that banks are loaning funds to commercial customers at or near their own cost of money. The remand results revealed, in pertinent part:

> The [RTG] benchmark for 1989, as originally calculated, was decidedly below the published December, 1989 interbank rate, and, when compared to a simple average of the monthly interbank lending rates in 1989 as found in the *BOT Quarterly Bulletin*, yields a spread of less than one percent, while the spread for the same period between the federal funds rate and the prime rate in the United States is twice that amount (*see, e.g., Standard & Poors Statistical Service Current Statistics*, July 1993, p. 4).

*Remand Results*, at 25. Commerce could reasonably conclude that a benchmark rate as close to interbank lending rates as those in the instant case cannot be a representative measure of lending by banks to their other commercial customers. Plaintiffs' comparison of rates paid on deposits to the benchmark rate does not detract from the significance of the unreasonably close position of the benchmark to the rates obtainable on interbank loans. *See* Plaintiffs' Reply Brief at 18.

### C.

Commerce's determination to discontinue its reliance upon the RTG benchmark formula is further supported by inaccuracies that resulted from the deduction of EPC loans from the benchmark. Commerce discovered that BOT, although deducting the entire amount of interest paid on EPC's from the numerator, failed to deduct the corresponding principal amount from the denominator. Instead, only that portion of the loans that were rediscounted by BOT (i.e., up to 50 percent of total principal outstanding) was deducted from the denominator. The result was an artificially low benchmark. In response, Commerce required BOT to change its methodology and deduct the entire principal amount from the denominator.

Plaintiffs reply that Commerce's misgivings concerning the reliability of the RTG benchmark are exaggerated, in view of the fact that the impact upon the benchmark results caused by the failure to exclude the total amount of principal from EPC loans was minuscule.[4] Nevertheless, the issue is not finally whether BOT's errors were harmless in the particular administrative review in question. Rather, the issue is whether the distortions caused by BOT's inaccurate execution of the benchmark formula, with regard to deductions for both interest on interbank loans and outstanding principal on EPC borrowing, constitute a legally sufficient predicate for Commerce's abandonment of the RTG benchmark. The court holds that, in identifying these deficiencies, Commerce has "articulate[d] a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

### D.

Before proceeding to consider Commerce's new benchmark methodology, the court addresses plaintiffs' objection to Commerce's explanation of its rejection of the RTG benchmark in light of a newly articulated rationale on the part of Commerce concerning BOT's exclusion of financial corporation loans from the RTG benchmark calculation. Specifically, in its remand results, Commerce determined that the weighted average of short-term loans that comprised the RTG benchmark should have included financial corporation loans, because such corporations are the second largest group of financial institutions in Thailand and offer short-term loans in Thai currency. *Remand Results* at 23–24. Commerce contends that such loans form an alternative source of funds that exporters might use if the subsidized program did not exist, and thus should properly be accounted for under the *Proposed Regulations*. Plaintiffs challenge Commerce's determination, arguing that the agency has impermissibly attempted to advance a new justification for its action in the *Butt–Weld Review*, outside the boundaries of

---

**4.** Inclusion of the balance of EPC principal increased the benchmark by 0.01 points in 1989 and 0.04 points in 1990. *See* Plaintiffs' Reply Brief at 32.

this court's remand instructions. The court agrees with plaintiffs.

For the reasons previously explained in its decision remanding this matter to Commerce, *see Royal Thai Government, supra,* the court made it plain that the remand proceedings were to be limited to the evidence and analysis underlying the agency's decision in *Steel Wire Rope,* and thus, the *Butt–Weld Review.* The court further observes that nowhere in the preliminary or the final determinations in the *Steel Wire Rope* investigation, or for that matter, the *Butt–Weld Review,* did Commerce even mention BOT's exclusion of financial corporation loans from the benchmark equation as a justification for the agency's abandonment of the benchmark, and that issue was certainly not before the court prior to its order remanding the action to Commerce. It was not until the remand proceedings that Commerce discussed financial corporation loans, and the record evidence demonstrates that the issue of their exclusion from the benchmark was not part of either the *Steel Wire Rope* determinations or its decision to abandon the RTG benchmark in its section 751(a) review in *Butt–Weld Pipe.* Therefore, since the court's remand order did not open the door to consideration of any grounds for rejection of the RTG benchmark not already articulated by Commerce in the *Steel Wire Rope* investigation, the court will not entertain Commerce's new rationale relating to the exclusion of financial corporation loans from the RTG benchmark raised for the first time on remand, and does not consider them in this decision.

## II.

■ It remains, therefore, to determine whether the selection of the new MLR/MOR benchmark methodology is supported by substantial evidence and is a reasonable means of effectuating the purpose of the countervailing duty statute. For the reasons that follow, the court resolves these issues in the affirmative.

During verification, Commerce was informed by officials of the Siam Commercial Bank of Thailand that the vast majority of short-term loans were made at the minimum loan and overdraft rates as published in the BOT Quarterly Bulletin. *See Remand Results* at 13 (citing *Showers Memo.*) Commerce further determined from the BOT Quarterly Bulletin that loans and overdrafts account for 70 percent of short-term financing in Thailand, "and thus constitute a preponderant source of financing." Since the RTG benchmark was lower than the average of the MLR and MOR rates, and low in relation to interbank lending rates, Commerce determined that MLR/MOR benchmark would be more representative of short-term financing in Thailand. *Remand Results* at 14 (citing *Garfinkel Memo.*)

While plaintiffs have adduced evidence of loans below MLR/MOR rates, plaintiffs cannot identify through record evidence the volume of or even the interest rates charged in connection with that lending, and thus, whether that lending was sufficiently substantial to negate Commerce's new benchmark methodology. Thus, having considered the record as a whole, the court is satisfied that Commerce's selection of the MLR/MOR benchmark methodology is supported by substantial evidence.

■ Finally, the court observes that Commerce's methodology is in compliance with the *Proposed Regulations.* Where no single, predominant source of financing exists, Commerce may calculate a benchmark under the regulations as a the average of multiple sources of alternative financing, weighted *wherever possible.* Although the RTG benchmark is a weighted average, and thereby equally permissible under the regulation, the court will not second guess Commerce's decision to use as a methodology an unweighted average that it considers to be more representative of country-wide rates.

## CONCLUSION

The court has received and reviewed the results of the remand proceeding ordered by the court's decision in *Royal Thai Government v. United States,* 824 F.Supp. 1089 (1993), and has considered plaintiffs' challenge thereto and the Government's response. The determinations of the Department of Commerce are supported by sub-

52

stantial evidence and are in accordance with law. It is therefore

ORDERED that the *Remand Results* filed by the Department of Commerce are affirmed; and it is further

ORDERED that plaintiffs' motion for judgment on the agency record is denied and this case is dismissed.

**IT IS SO ORDERED.**