MITSUI & CO., LTD., AND MITSUI & CO. (U.S.A.) INC., PLAINTIFFS *v.* UNITED STATES, AND U.S. DEPARTMENT OF COMMERCE, DEFENDANTS, AND FLORIDA WIRE & CABLE CO., DEFENDANT-INTERVENOR

Court No. 90-12-00633

(Dated March 11, 1994)

*Willkie, Farr & Gallagher, (Christopher A. Dunn, Daniel L. Porter, David E. Bond)* for plaintiffs Mitsui & Co. Ltd. and Mitsui & Co. (U.S.A.) Inc.
*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, *(Velta A. Melnbrencis),* of counsel: *Barbara Campbell Potter,* Import Administration, U.S. Department of Commerce for defendants.
*Collier, Shannon, Rill & Scott, (Paul C. Rosenthal, Kathleen Weaver Cannon, Mary T. Staley)* for defendant-intervenor Florida Wire & Cable Company.

## MEMORANDUM OPINION

MUSGRAVE, *Judge:* In this action, plaintiffs Mitsui & Co., Ltd. and its wholly-owned subsidiary Mitsui & Co. (U.S.A.) Inc., challenge the final results of the administrative review of antidumping findings announced by the International Trade Administration, U.S. Department of Commerce ("ITA" the "Department" or "Commerce"): *Steel Wire Strand for Prestressed Concrete From Japan; Final Results of Antidumping Duty Administrative Review,* 55 Fed. Reg. 46,853 (November 7, 1990). The review covered seven periods from 1978 to 1985, and resulted in a 15.8% antidumping duty based on best information available ("BIA"). Plaintiffs argue that the ITA did not have authority in 1987 to initiate an administrative review of plaintiffs' entries for the period April 1, 1978 to November 30, 1985 and that the ITA's decisions to conduct the administrative review and to resort to BIA and the ITA's particular choice of BIA are not supported by substantial evidence.

## BACKGROUND[1]

On December 8, 1978, the U.S. Department of the Treasury ("Treasury") published an antidumping duty order on steel wire strand for prestressed concrete ("PC strand") from Japan. *Steel Wire Strand for Prestressed Concrete From Japan; Finding of Dumping,* 43 Fed.Reg. 57,599 (December 8, 1978). The government's finding stated that the Secretary had determined that PC strand, except that produced by Kawatetsu Wire Products Co., Ltd. ("Kawatetsu") was being sold at less than fair value ("LTFV") within the meaning of section 201(a) of the Antidumping Act (1921). In addition, the International Trade Commis-

---

[1] The Court quotes without attribution the uncontroverted facts in the record. Citations to documents contained in the public record of this administration review are designated "P.R.". Citations to documents contained in the confidential record of this administrative review are designated "C.R.".

sion had determined and notified the Secretary that an industry in the United States was being injured by reason of the importation of PC strand that was being sold at LTFV. As a consequence of those findings, PC strand, except that produced by Kawatetsu, became subject to anti-dumping duties.

Mitsui & Co., Ltd. ("Mitsui") is a Japanese trading company that exported PC strand to the United States and imported it through its wholly-owned U.S. subsidiary, Mitsui & Co. (U.S.A.) Inc. ("Mitsui USA"). Mitsui is not a manufacturer of PC strand and does not sell PC strand in Japan. Due to the nature of Mitsui's business operation, it was not investigated in the original fair value investigation conducted by the Treasury that led to the antidumping duty order on this product.

On April 24, 1979, approximately four months after the publication of the antidumping duty order on PC strand, Treasury forwarded anti-dumping questionnaires to Mitsui covering the period April 1, 1978 through March 31, 1979 (Period I). *Letter from U.S. Customs Service to Mitsui,* P.R. Document 44. This questionnaire instructed Mitsui to pro-vide information on its selling prices of PC strand in both the United States and the home market. The questionnaire made clear, however, that if Mitsui was an exporter that did not sell merchandise in the home market, then it need only supply general corporate information plus certain information on U.S. sales prices. *Id.* at 5. Mitsui submitted its response on May 24, 1979. *See Treasury ROI-Transmitting Mitsui Response,* C.R. Document 1, Frame 2. Mitsui received no further instructions from Treasury.

On January 1, 1980, pursuant to the Trade Agreements Act of 1979, jurisdiction over antidumping matters was transferred from the Treasury Department to Commerce. After Commerce assumed the responsibility for administering the antidumping law, it commenced administrative reviews of PC strand. On February 5, 1981, Commerce issued Mitsui a questionnaire covering the period April 1, 1979 through November 30, 1980 (Period II). *Letter from U.S. Department of Com-merce to Mitsui,* P.R. Document 45. The cover letter to the questionnaire also requested additional information covering the period of Mitsui's prior submission (Period I), which Commerce found "deficient * * * in that the data reflected therein covered only inter-company transactions * * *." *Id.* On April 23, 1981, Mitsui transmitted its response to Com-merce's questionnaire. *See Treasury ROI-Transmitting Mitsui Response,* C.R. Document 2, Frame 37. In this response, Mitsui provided information about its sales, but noted that the information on U.S. resales would have to be obtained from Mitsui USA. *Id.* at p. 2. The record does not indicate whether Commerce ever requested the information from Mitsui USA.

On December 18, 1981, Commerce sent Mitsui an additional question-naire, covering the period December 1, 1980 through November 30, 1981 (Period III). *Letter from U.S. Department of Commerce to Mitsui,* P.R. Document 46. The general instructions to this questionnaire state

once again that if Mitsui did not sell the merchandise in the home market, it need only provide general corporate information and sales prices to the United States. There is no mention in the questionnaire of the alleged "deficiency" in the earlier response, nor did it request information on U.S. sales by Mitsui USA. On March 25, 1982, Mitsui responded to Commerce's questionnaire covering Period III. *See Treasury ROI-Transmitting Mitsui Response,* C.R. Document 3, Frame 102. Mitsui received no further word from Commerce on this response.

On May 20, 1982, Commerce issued a preliminary determination on the product covering Periods I and II. *Steel Wire Strand for Prestressed Concrete From Japan; Preliminary Results of Administrative Review of Antidumping Findings,* 47 Fed. Reg. 21,909 (May 29, 1982). This preliminary determination provided separate rates for every manufacturer from whom Mitsui had purchased PC strand. *Id.* The determination specifically identified those rates applicable to Mitsui.

On December 29, 1982, Commerce issued Mitsui another questionnaire, covering the period December 1, 1981 through November 30, 1982 (Period IV). *Letter from U.S. Department of Commerce to Mitsui,* P.R. Document 47. This questionnaire maintained that Mitsui need only provide general corporate information and information on U.S. Sales. In the cover letter accompanying the questionnaire, there was no reference to any of Mitsui's prior antidumping responses. On March 15, 1983, Mitsui submitted its response to Commerce's questionnaire for Period IV. *See Treasury ROI-Transmitting Mitsui Response,* C.R. Document 4. Mitsui received no information from Commerce concerning the adequacy of this response.

In July of 1982, Mitsui USA pled guilty to 21 counts of conspiracy to evade antidumping duties and the Trigger Price Mechanism on various steel products, including PC strand. *See* P.R. Document 1, Frame 7. Consequently, Commerce excluded Mitsui from the final results of the administrative review covering Period I and II. *Steel Wire Strand for Prestressed Concrete From Japan; Final Results of Administrative Review of Antidumping Finding,* 48 Fed. Reg. 45,586, 45,587 (October 6, 1983). Commerce did not, however, explain how the U.S. company's guilty plea to Customs fraud related to the antidumping response.

Subsequently, Commerce submitted to Mitsui an antidumping questionnaire for the period December 1, 1982 through November 30, 1983 (Period V). No record of this questionnaire exists in the files, and none has been furnished in the administrative record, so it is not possible to determine what information was requested in that mailing. However, it is clear that such a questionnaire existed because Mitsui explicitly referred to it in its questionnaire response dated June 10, 1984. *See Treasury ROI-Transmitting Mitsui Response,* C.R. Document 5. For approximately the next three years, Mitsui heard nothing further from Commerce.

On June 17, 1987, Commerce published a notice stating that it had initiated a review of the dumping finding on PC strand with respect to

Mitsui for Periods I through V. *Initiation of Antidumping Duty Adminis-
trative Reviews; Japanese Steel Wire Rope and Steel Wire Strand for Pre-
stressed Concrete,* 52 Fed. Reg. 23,063 (June 17, 1987). According to a
file memorandum, Commerce was self-initiating the review due to Mit-
sui USA pleading guilty to 21 counts of conspiracy to evade antidumping
duties and the Trigger Price Mechanism back in July of 1982. *Memoran-
dum to Undersecretary Regarding Self-Initiation,* P.R. Document 1,
Frame 7.

On August 6, 1987, Commerce sent to Mitsui a questionnaire,
requesting complete sales pricing and cost information covering the
period April 1, 1978 through November 30, 1985. *Letter from Div. Dir/IA
Attache to Mitsui & Co. Ltd.,* P.R. Document 5, Frame 71. The cover let-
ter to the questionnaire stated that Mitsui need not supply sales
information for those periods for which it had already supplied informa-
tion. Mitsui was instructed, however, to indicate the period(s) for which
it has already supplied such information and the dates on which that
information was filed. *Id.* at Frame 73.

On September 11, 1987, within the 30 day period provided for a
response, Mitsui responded to Commerce's questionnaire. *Letter from
Mitsui & Co., Ltd.,* P.R. Document 6, Frame 125. In its response, Mitsui
stated that it had provided complete responses for every review year
from April 1, 1978 through November 30, 1983. Mitsui also claimed that
all the PC strand that it had sold during the period December 1, 1983 to
November 30, 1985 was manufactured by Kawatetsu, which was, there-
fore, excluded from the dumping finding. *Id.*

By letter dated November 25, 1987, Commerce requested that Mitsui
provide a consolidated sales listing on computer tape for the periods
April 1, 1978 through November 30, 1983 for completion of Commerce's
analysis. *Letter from Div. Dir/IA to Mitsui & Co. Ltd.,* P.R. Document 7,
Frame 126. In addition, Commerce sought new information concerning
U.S. sales, *i.e.,* information on U.S. resales of the imported PC Strand to
the first unrelated buyers in the United States. In connection with the
new information, Commerce sought information relating to Mitsui as
well as Mitsui USA. This request sought to elicit information on resales
of PC strand to the first U.S. customer, such as, the identity of the cus-
tomer, Mitsui USA's price to the customer, discounts to the customer,
and commissions to unrelated agents. Commerce also requested
information with respect to the parties with whom customers placed
their orders, whether the terms of sale were set before or after the date
of importation, and whether Mitsui or Mitsui USA granted any addi-
tional credits or rebates to U.S. customers. *Id.* at 2. The sales listing was
to cover the same seven and one-half years of sales. Commerce allowed
Mitsui thirty days, or until December 25, 1987, to submit the requested
information. *Id.*

On January 7, 1988, Mitsui submitted a request for an extension of
time of an additional sixty days to respond to Commerce's request for
information. *Letter from Law Firm of Barnes, Richardson & Colburn*

*(hereinafter "BR&C"),* P.R. Document 8, Frame 131. Mitsui's letter noted that the information requested covered more than seven years, that much of the information had previously been supplied in the course of five prior antidumping responses, and that the newly-requested information had to be obtained from numerous Mitsui USA branch offices throughout the country. *Id.* at 2.

On February 2, 1988, Commerce advised Mitsui that it would grant only a 15-day extension for submitting the requested information or until February 17, 1988. *Letter From Div. Dir./IA to Law Firm of BR&C,* P.R. Document 9, Frame 133.

On February 17, 1988, counsel for Mitsui met with Commerce Deputy Assistant Secretary for Import Administration. At that meeting, Mitsui requested a further extension of time until March 4, 1988 in order to complete the collecting of the requested information, claiming that the process was approximately 65 to 75 percent complete. *Letter From Law Firm of BR&C,* P.R. Document 10, Frame 134. This meeting was followed by a written request for an extension on February 18, 1988. *Id.* By letter dated February 29, 1988, Commerce advised Mitsui that since Commerce already granted one extension until February 17, 1988, it would be unable to grant any additional extensions because of "strict time constraints." *Letter From Div. Dir./IA to Mitsui & Co.,* P.R. Document 11, Frame 135. The letter noted that Mitsui's complete response was due on February 17, 1988 and advised Mitsui that Commerce may base its appraisements "upon the best information available." *Id.*

On March 4, 1988, Mitsui and Mitsui USA responded to Commerce's request for production. With respect to third country sales, Mitsui stated that the data had been previously submitted. With respect to U.S. sales, Mitsui submitted a computer tape for the periods April 1, 1978 to November 30, 1983. With respect to customer orders, Mitsui allege that they were placed with Mitsui USA, which, in turn, had placed them with Mitsui. With respect to the terms of sale, the terms between Mitsui and Mitsui USA were set before the date of importation, at the time of contract, while the terms of salt with U.S. customers were set at the time of contract between Mitsui USA and the customer, which could be either before or after the time of importation. Mitsui claimed that there were no credits or rebates to U.S. customers other than those shown in the responses. *Letter From Law Firm of BR&C,* C.R. Document 6, Frame 179.

On April 26, 1988, Commerce issued its preliminary determination. *Steel Wire Strand for Prestressed Concrete from Japan: Preliminary Results of Antidumping Administrative Review,* 53 Fed. Reg. 16,180 (May 5, 1988) (hereinafter "P.C. Strand Preliminary Determination"). According to these results, Commerce determined a dumping margin for Mitsui of 15.80% *ad valorem.* This dumping margin was applicable to the periods April 1, 1978 through November 30, 1985, and was based upon BIA. The stated reasons for resorting to the BIA were as follows:

> Mitsui provided untimely and inadequate responses to the Department's questionnaires. The responses were inadequate because, despite several requests, Mitsui furnished a computer tape which omitted a large number of U.S. prices, quantities, and adjustments.

55 Fed. Reg. at 16,181.

On May 6, 1988, counsel for Mitsui submitted a request for a disclosure conference for an explanation of the reasons and methodology used in the P.C. Strand Preliminary Determination results. *Letter From Law Firm of BR&C,* P.R. Document 16, Frame 170. The disclosure conference was held on May 13, 1988. At this conference, Commerce disclosed that there were "omissions" in the data submitted by Mitsui for all of the five years covered by the review. *Transcript of Hearing,* P.R. Document 25, Frame 1038, at 12. Commerce delivered to Mitsui a printout of the data and showed counsel for Mitsui where the omissions were. *Id.* Upon reviewing this printout, counsel for Mitsui realized that while information was missing for two of the five review years, for the remaining three years there were no gaps. Mitsui contends that what Commerce had thought were gaps in the data for three of the five years were, in fact, instances where a given contract with a customer comprised multiple shipments. In those cases, the name of the customer and the size and grade of the product were not repeated, creating the appearance of "gaps" when in fact there were none. Counsel for Mitsui brought these facts to Commerce's attention by letter dated May 31, 1988. *Letter From Law Firm of BR&C,* C.R. Document 7, Frame 839. In that submission, Mitsui also provided a copy of selected pages of printout, circled and underlined to show that the "gaps" were, in fact not gaps at all. Thereafter, counsel for Mitsui offered to meet with Commerce to review the record or answer any remaining questions relating to the computer tape. *Id.* at 2.

In addition, on May 31, 1988, Mitsui submitted an updated computer tape that further clarified and supplemented the tape submitted on March 4, 1988. The updated tape provided additional information that had been missing for two of the five periods covered. *Letter from Law Firm of BR&C,* C.R. Document 8, Frame 828.

On October 30, 1989, Commerce issued its final determination. *Steel Wire Strand for Prestressed Concrete From Japan; Final Results of Antidumping Administrative Review,* 55 Fed. Reg. 46,853 (November 7, 1990) (hereinafter "P.C. Strand Final Results"). Commerce based the dumping margin for Mitsui for all periods reviewed upon BIA, which was the highest rate from the fair value investigation. Commerce used the BIA, because the data submitted by Mitsui was deficient in many respects:

> For this review, we had to determine whether or not, or to what extent, Mitsui USA resold strand in the United States during the review periods at a net price below the price from the Japanese manufacturers to Mitsui Japan. We were unable to make this determination.

We required that Mitsui provide a transactional database that clearly tied resales of Mitsui USA to purchases from the manufacturer. Mitsui provided an inadequate response to our request for reseller information. Mitsui did not explain how the invoices from Mitsui to Mitsui USA (and the strand prices shown on these invoices) related to the later resales of strand from Mitsui USA to Mitsui's U.S. customers. This deficiency existed for many of Mitsui's first period * * * and second period * * * sales. Such information was also lacking on certain third period * * * and fourth period * * * sales. Additionally, Mitsui did not provide the U.S. selling prices for many of its first and second period and for some of its third and fourth period sales. Also, for all five periods, Mitsui failed to provide various data, including the date of payment from Mitsui's U.S. customers * * *.

55 Fed. Reg. 46,583–84.

Commerce further elucidated that the computer tape submitted on March 4, 1988 by Mitsui was untimely. In addition, Commerce rejected Mitsui's characterization of the May 31, 1988 revised computer tape as "clarifying" data or "verification exhibits" because the May 1988 revised computer tape constituted new data that was untimely submitted:

Mitsui submitted its second computer tape after we published our preliminary results, and we do not accept submissions following publication of our preliminary results. Mitsui's second computer tape does not constitute verification exhibits or clarifying data, but rather factual data essential to our analysis of Mitsui's sales.

55 Fed. Reg. at 46,854.

STANDARD OF REVIEW

In reviewing injury, antidumping, and countervailing duty investigations and determinations, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) *(quoting Consolidated Edison Co. v. Labor Board,* 305 U.S. 197, 229 (1938)). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm's,* 338 U.S. 607, 619–20 (1966); *See also Matsushita Electric Industrial Co. v. United States,* 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984). Moreover, the Court may not substitute its judgment for that of the agency when the choice is between two fairly conflicting views, even though the Court would justifiably have made a different choice had the matter been before it *de novo. See American Spring Wire Corp. v. United States,* 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) *(citing Universal Camera, 340 U.S. at 488),*

*Aff'd sub nom. Armco, Inc. v. United States,* 3 Fed. Cir. (T) 123, 760 F.2d 249 (1985).

Substantial evidence supporting an agency determination must be based on the whole record. *See Universal Camera Corp.,* 340 U.S. 474, 488 (1951). The "whole record" means that the Court must consider both sides of the record. It is not sufficient to examine merely the evidence that sustains the agency's conclusion. *Id.* In other words, it is not enough that the evidence supporting the agency decision is "substantial" when considered by itself. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Universal Camera Corp.,* 340 U.S. at 478, 488.

DISCUSSION

1. *Mitsui's Challenge to Commerce's Administrative Review for the Period April 1, 1978 through November 30 1985:*

Mitsui argues that Commerce lacked the authority to initiate an administrative review of Mitsui's sales during this period because it did not initiate the review within the deadlines established by law. Prior to 1984, Commerce was required to review automatically all antidumping duty orders on an annual basis. *See* Pub. L. No. 96–39, 93 Stat. 151, 175 (1979). In 1984, Congress amended 19 U.S.C. § 1675 so that Commerce was required to conduct an administrative review of an antidumping duty order *only* "if a request for such a review has been received." Trade and Tariff Act of 1984 § 611, Pub. L. No. 98–573, 98 Stat. 2948 (1984).

To implement the amended section, Commerce issued interim regulations requiring that for orders published before September 1, 1983 and review periods ending before September 1, 1985, a person eligible to request an administrative review must have done so no later than October 31, 1985. 19 C.F.R. § 353.53(c)(F) (1985). Consequently, if a timely request was not filed (*i.e.,* no request was made by October 31, 1985) antidumping duties were to be assessed "at rates equal to the cash deposit of (or bond for) estimated antidumping duties required on that merchandise at the time of entry * * *." 19 C.F.R. § 353.53a(d)(1) (1985).

On June 17, 1987, Commerce initiated an administrative review of Mitsui's entries of PC strand during the period April 1, 1978 through November 30, 1985. Mitsui argues that the time limitation of 19 C.F.R. § 353.53(c)(F) precludes review of Mitsui's entries for the period April 1, 1979 through November 30, 1984, because the review was not initiated before the October 31, 1985 deadline. *Plaintiff's Memorandum In Support For Judgment Upon The Agency Record,* at 21–27.

Similarly, Mitsui argues that review of entries for the period of December 1, 1984 through November 30, 1985 is precluded because it was initiated after the anniversary month for that period of review had passed. The applicable regulations required that if Commerce initiated an administrative review, it must "no later than 10 days after the anniversary month * * * publish in the Federal Register a notice of 'Initiation of Antidumping Duty Administrative Review.'" *See* 19 C.F.R.

§ 353.53a(c)(1) (1985). Mitsui explains that a review must be initiated within 10 days of the anniversary month because the date of initiation and publication coincide. Because Commerce did not adhere to its regulations, Mitsui concludes that the results of the review are void. *Plaintiffs Memorandum* at 27–28.

As a threshold defense, Commerce argues that because Mitsui did not raise the issues of timeliness of initiation of the reviews before the ITA, Mitsui is precluded from doing so now. *Defendant's Memorandum In Opposition To Plaintiffs' Motion For Judgment Upon The Administrative Record* at 20 *et seq.* Commerce asserts that the statutory requirement of exhaustion of administrative remedies operates to bar the Court from considering the issue. *See* 28 U.S.C. § 2640(b) (emphasizing the legislative intent to require exhaustion of administrative remedies).

In any event, Commerce argues, the timeliness arguments are without merit. The 1985 regulations Mitsui relies upon concern requests for administrative review by interested parties, not the self-initiation that occurred here. Commerce is authorized to conduct reviews for changed circumstances as well as periodic reviews. 19 U.S.C. § 1675(b) provides:

> Whenever the administering authority * * * receives information concerning, or a request for the review of, * * * an affirmative determination * * * which shows changed circumstances sufficient to warrant a review of such determination, it shall conduct such a review after publishing notice of the review in the Federal Register * * *.

The regulation that implemented 19 U.S.C. § 1675(b) was 19 C.F.R. § 353.53(b) (1985), which contained the following pertinent language:

> Whenever the Secretary receives information concerning, or a request for the review of, an Antidumping Duty Order or Finding or an agreement on the basis of which an investigation was suspended, which shows changed circumstances sufficient to warrant a review of such Order, Finding or agreement, he shall * * * publish a "Notice of Intention to Review Antidumping Duty Order" * * * in the Federal Register * * *.

Section 353.53(b) was first published in 1985 and its contents remained unchanged until 1989, when it was revised and recodified as 19 C.F.R. § 353.22(f). Commerce asserts that the above pertinent excerpts do not specify a time period within which the Secretary of Commerce must self-initiate a review or publish a notice of initiation of review.

Commerce further argues that the 1984 amendment to the periodic review regulation, *i.e.,* 19 C.F.R. § 353.53a, does not apply to the entries affected by the final results in this case even if review was commenced under that regulation, because the investigation was completed in 1978, and the entries affected were made from April 1, 1978 through November 30, 1983. *See Interredec, Inc. v. United States,* 11 CIT 45, 652 F. Supp. 1550 (1987). According to Commerce, it had already initiated a review of the April 1, 1978 through November 30, 1983 periods before the effec-

tive date of the 1984 amendment, and simply continued the review after the self-initiation in 1987. *Defendants Memorandum* at 36.

Mitsui does not challenge Commerce's assertion that it failed to raise these arguments before the ITA. In addition, Mitsui does not dispute Commerce's arguments with respect to the statutory requirements requiring exhaustion of administrative remedies, but argues that the application of the exhaustion doctrine is discretionary, noting that 28 U.S.C. § 2637(d) states that "The Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." *Plaintiffs' Reply Memorandum*, at 21. Mitsui refers to *Hercules, Inc. v. United States,* 11 CIT 710, 735, 673 F. Supp. 454, 476 (1987), to support the proposition that "When a claim is purely legal, and does not add factual data to the record, it is within the court's discretion to consider the claim." *Id.* at 22. Alternatively, Mitsui asserts that it would have been futile to raise the arguments against initiation, because Commerce had already initiated the review. *Id.* at 24–25.

The usual statement of the exhaustion doctrine is that to preserve an issue for judicial review it must have been raised at the administrative level "at the time appropriate under the agency's] practices" *United States v. LA. Trucker Truck Lines, Inc.,* 344 U.S. 33, 37, (1952). In the instant type of action, the Court is statutorily directed to apply the exhaustion requirement "where appropriate." 28 U.S.C. § 2637(d) (1982). In light of this quoted language, Congress did not intend 28 U.S.C. § 2637(d) to be jurisdictional in nature. *United States v. Priority Prods., Inc.,* 4, Fed. Cir. (T) 88, 93, 793 F.2d 296, 300 (1986); *Timken Co. v. United States,* 10 CIT 86, 93, 630 F. Supp. 1327, 1334 n.2 (1986); *Phillips Bros. v. United States,* 10 CIT 76, 78, 630 F. Supp. 1317, 1320, *appeal dismissed on motion of appellee,* App. No. 86–1122 (Fed. Cir. July 18, 1986). While notions of the integrity of the administrative process, as embodied in the statute, suggest that exhaustion should be the "general rule," *Allen v. Regall,* 9 CIT 615 (1985), the courts must resist inflexible applications of the doctrine—characteristic of jurisdictional rules— which frustrate the ability to apply exceptions developed to cover "exceptional cases or particular circumstances * * * where injustice might otherwise result" if it were strictly applied. *Rhone Poulenc, S.A. v. United States,* 7 CIT 133, 134, 583 F. Supp. 607, 609 (quoting *Hormel v. Helvering,* 312 U.S. 552, 557 (1941). In *Hormel* the Supreme Court stated:

> There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below.

312 U.S. at 557.

In the *Hormel* case the Supreme Court had just issued an opinion which made the previously unraised issue determinative, therefore the

Supreme Court considered the new point of law even absent administrative exhaustion.

This was also the result in *In Re Elmore,* 382 F.2d 125 (D.C. Cir. 1967), where the court found that despite failure to raise certain aspects of claims at the administrative level, remand for further proceedings was appropriate. In that case, the D.C. Circuit court made it clear that plaintiff had rights which had not been recognized previously. Other courts have recognized some flexibility in the exhaustion doctrine. *See McKart v. United States,* 395 U.S. 185, 201 (1969) (exhaustion doctrine need not be "applied blindly in every case"); *cf. Kokusai Electric Co. v. United States,* 10 CIT 166, 172, 632 F. Supp. 23, 28 (1986) (holding that neglect to raise an issue prior to the close of Commerce's investigation will not be excused absent "extraordinary circumstances"); *L.A. Trucker Truck Lines, supra,* 344 U.S. at 35 ("Appelle did not offer * * * any excuse for its failure to raise the objection * * * during the administrative proceeding. Appellee does not claim to have been misled or in any way hampered in ascertaining the facts * * *.").

While there may be exceptional cases or particular circumstances which might require a court to consider questions of law which were neither pressed nor passed upon by the agency, this case is not such a case. In contrast, there has been no interpretation of existing law after Commerce's determination, which, if applied, might have materially altered the result. Further, it appears from the facts in this case, that it would not have been futile for Mitsui to argue that the agency did not comply with its own regulations.

It is well established that the defense of failure to comply with regulations is considered an affirmative defense. *United States v. Atkinson,* 6 CIT 257, 259, 575 F. Supp. 791, 793 (1983), and cases cited therein. Rule 8(d) of the United States Court of International Trade, which is analogous to Rule 8(c) of the Federal Rules of Civil Procedure, requires a party to plead its affirmative defenses. This Court has held that failure to do so results in waiver of such defenses and their exclusion from an action. *See e.g. Manifattura Emmepi S.P.A. v. United States,* 16 CIT 619, 621, 799 F. Supp. 110, 112–113 (1992); *United States v. Atkinson, supra,* 6 CIT at 259, 575 F. Supp. at 793. If Mitsui desired to assert facts which put Commerce's failure to follow its own regulations at issue, it should have so pleaded in its answer. "In pleading to a preceding pleading, a party shall set forth affirmatively * * * illegality, laches, * * * statute of limitations, waiver and any other matter constituting an avoidance or affirmative defense." CIT Rule 8(d). *See also Hall v. U.S. Postal Service,* 857 F.2d 1073 (6th Cir. 1988); *Little v. United States,* 794 F.2d 484, 487 n.2 (9th Cir. 1986) ("exhaustion of administrative remedies * * * must be plead in the trial court").

Plaintiffs have not provided a sufficient reason for not raising the issue at the administrative level that justifies application of an exception to the exhaustion doctrine. Therefore, the Court finds that plain-

tiffs are barred from raising arguments relevant to the timeliness of Commerce's review proceedings.

2. *Commerce's Decision To Review Mitsui's Shipments:*

Plaintiffs argue that the decision to review Mitsui's importations is not supported by substantial evidence or otherwise in accordance with law. As noted above, Mitsui is a trading company, and does not manufacture any of the "PC strand" at issue. All of the manufacturers that sold PC strand to Mitsui knew that it was to be exported to the United States. *Plaintiff's Memorandum* at 28–29. Therefore, Mitsui should not have been included in the administrative reviews. Plaintiffs cite, for example, *Anitfriction Bearings (other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, et al.* 56 Fed. Reg. 31,692, 31,747 (July 11, 1991):

> The Department found that all of Peer Int'l's suppliers had knowledge at the time they sold their merchandise to Peer Int'l that those sales were destined for the United States * * *. As such, the Department considers them the source of any dumping activity.

*Plaintiffs' Memorandum* at 30.

In accordance with this approach, Commerce has taken the position that it will not initiate an investigation of a trading company without "timely and convincing" evidence of dumping, and will not investigate middleman dumping unless the allegation can be supported by pricing or cost data. *Antidumping; Final Determination of Sales at Less Than Fair Value; Certain Forged Steel Crankshafts from Japan,* 52 Fed. Reg. 36,984, 36,985 (October 2 1987). Middleman dumping is reselling in the United States at prices less than the trading company's cost of acquisition.

Plaintiffs argue that Commerce's decision to investigate Mitsui was not based on "timely and convincing" evidence because it was based on a memo which noted that in July 1982, Mitsui USA pled guilty to 21 counts of conspiracy to evade antidumping duties.[2] Mitsui contends that Commerce relied on this memorandum, which refers to unspecified newspaper accounts, and failed to examine any relevant cost and price data for the review periods. Further, Mitsui asserts that the data supplied by it would have demonstrated that Mitsui resold the subject merchandise to its United States subsidiary at prices higher than its acquisition cost. *Plaintiffs Memorandum* at 31–32.

Commerce replies that Mitsui failed to raise this issue administratively as well. Commerce notes that during the administrative proceeding, Mitsui never questioned Commerce's stated reasons for self-initiating the reviews or the underlying facts, Commerce's conduct of a "middleman" inquiry with respect to Mitsui, or Commerce's refer-

---

[2] Commerce's 1987 decision to investigate Mitsui was based solely on an undated page and a half memorandum from Gilbert B. Kaplan, Deputy Assistant Secretary for Import Administration, which noted unspecified "newspaper accounts" stating that "in July 1982 Mitsui pleaded guilty to 21 counts of conspiracy to evade antidumping duties and the Trigger Price Mechanism on various steel products." *Memorandum to Undersecretary Regarding Self-Initiation,* P.R. Document 1, Frame 7.

ences to Mitsui's guilty plea.[3] *Defendant's Memorandum,* at 41. Commerce points out that in its pre-hearing brief before the ITA, Mitsui stated that it "does not take issue herein with Commerce's 'middleman' inquiry in general." P.R. Document 22, at 15–16. Mitsui did argue, however, that if the resale data revealed no sales at less than acquisition cost, Mitsui's margin should be based upon a purchase price calculation, for which all data was allegedly in Commerce's possession. *Id.* at 16.

Commerce states that it relies on purchase price calculations rather than exporter's sales price only when "[t]here is nothing in the record to indicate that the middleman is an agent of the exporter," which is not the situation. *Final Determination of Sales at Less Than Fair Value; Acetylsalicylic Acid (Aspirin) from Turkey,* 52 Fed. Reg. 24,492, 24,493 (July 1, 1987). Further, Mitsui points to nothing in the record that indicates its producers knew that the PC strand would be exported to the United States. *Defendant's Memorandum* at 39.

Mitsui responds that Commerce did have evidence in 1987 that Mitsui's suppliers knew that the merchandise would be exported to the U.S. because each had been assigned its own dumping rate in the 1978 dumping order, which would not have occurred if they did not know that the merchandise sold to trading companies was bound for the U.S. *Plaintiffs' Reply Memorandum,* at 27. Further, Mitsui argues that the guilty plea evidence was not the only reasonably available evidence since Mitsui had responded to 5 questionnaires respecting the subject merchandise prior to the initiation of this review. *Id.* at 28.

While Commerce does normally require "timely and convincing" evidence of dumping before initiating an investigation of a trading company, that evidence need only be that which is "reasonably available" to Commerce. *Preliminary Determination of Sales at Less Than Fair Value; Certain Stainless Steel Cooking Ware from the Republic of Korea,* 51 Fed. Reg. 24,563, 24,564 (July 7, 1986). Commerce contends that the "reasonably available" evidence here was Mitsui USA's plea of guilty to 21 counts of conspiracy to evade antidumping duties using kickbacks, credits, and secret rebates. *Defendants Memorandum,* at 39–41. If there were kickbacks, credits or secret rebates, the price information previously submitted would not disclose middleman dumping. Therefore, Commerce concludes the facts are sufficient to support the review. *Id.* at 42.

There is no evidence in the record indicating when Commerce took notice of the "newspaper accounts" stating that "in July 1982 Mitsui pleaded to 21 counts of conspiracy to evade antidumping duties * * *." *See* P.R. Document 1, Frame 7. Since Commerce used this information to base its decision to review, the Court will deem that Commerce took

---

[3] Although Mitsui refers to the evidence of Mitsui USA's guilty plea as "unspecified newspaper accounts," Commerce points out that Mitsui never administratively questioned the ITA's stated reasons for initiating the reviews or the underlying facts. At a hearing on June 9, 1988, Mitsui's counsel admitted that "in the summer of 1982 Mitsui USA pled guilty to * * * a criminal investigation undertaken by the Customs Service involving imported steel," and characterized the investigation as a "fraud" investigation. P.R. Document 25, at 8 and 29.

notice of the newspaper articles at the time of publication. If indeed, Commerce knew about these newspaper articles in 1982, *i.e.* if they were published then, and Commerce did nothing about it until 1987, then the review raises serious concerns of fundamental fairness and due process. However, the Court need not resolve these issues since Mitsui waived its rights by acquiesing to the "middleman" review at the administrative level.

3. *Commerce's Decision to Calculate a Dumping Margin Based on Best Information Available:*

In addition to arguing that Commerce's review is timebarred, Mitsui also contends that the decision to resort to BIA was not supported by substantial evidence. Commerce asserts four deficiencies in Mitsui's submissions as a basis for resorting to BIA: 1) Mitsui's failure to explain how invoices from Mitsui to Mitsui USA related to later resales of PC strand from Mitsui USA to unrelated U.S. customers; 2) Mitsui did not provide the U.S. selling prices for some sales from the I, II, III, and IV periods; 3) Mitsui failed to provide the date it received payment from U.S. customers, and; 4) Mitsui's computer tapes were untimely submitted.

It is firmly established that "whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, [the ITA shall] use the best information otherwise available." *See* 19 U.S.C. § 1677e(c) (1993 Supp.);[4] *see also Allied-Signal Aerospace Co. v. United States,* ____ Fed. Cir. (T) ____, ____, 996 F.2d 1185, 1190 (1993); *Technoimportexport v. United States,* 15 CIT 250, 257, 766 F. Supp. 1169, 1176 (1991); *N.A.R., S.p.A. v. United States,* 14 CIT 409 414, 741 F. Supp. 936, 941 (1990). The ability of the agency to set and enforce its own deadlines is an area well within its discretion,[5] and a party has an obligation to file by ITA deadlines or to obtain extensions of time. The law does not permit a party to pick and choose information it wishes to present to the agency, and a deficient submission may lead to an undesired result. *See N.A.R., S.p.A.,* 14 CIT at 415, 741 F. Supp. at 941. Nonetheless, the regulations in effect during the underlying proceeding reflected the statute's preference that determinations be based on the respondent's actual information. 19 C.F.R. § 353.51(b) (1988) offered an

> opportunity to correct inadequate submissions * * * if the correct submission is received in time to permit proper analysis and verification of the information concerned; otherwise no corrected submission will be taken into account.

[4] **(c) Determination to be made on best information available**
    In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produceÿ20information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

[5] *See, e.g. Rhone Poulenc, Inc. v. Unites States,* 13 CIT 218, 710 F. Supp. 341 (1989), *aff'd* 8 Fed. Cir. (T) 61, 899 F.2d 1185 (1990).

As to the first deficiency, Mitsui counters that Commerce never specifically requested information on how invoices from Mitsui related to invoices to U.S. customers, and that nothing in the record indicates that Commerce could not understand this relationship from Mitsui's submissions—which it claims was obvious from Mitsui's computer printouts. *Plaintiffs' Memorandum,* at 40. Moreover, Mitsui argues that the only information relevant to dumping was the price at which the supplier sold the subject merchandise to Mitsui and the price at which Mitsui USA sold to the U.S. customers. The invoice prices from Mitsui to Mitsui USA is irrelevant. *Id.* at 41.

Although Commerce argues that it may not have specifically requested that Mitsui explain the relation between invoices, had Mitsui provided the requested information, Commerce would have possessed the information needed to provide the necessary linkage between Mitsui's purchases of PC strand from its suppliers, the sales of those purchases to Mitsui USA, and their subsequent resale to Mitsui USA's U.S. customer. Because Mitsui did not supply all the requested information, Commerce was unable to trace Mitsui's purchases to resales in the United States and determine whether or not Mitsui USA was selling PC strand in the United States at prices below Mitsui's acquisition costs for the PC strand. *Defendant's Memorandum* at 48–49.

It is axiomatic that Commerce may not resort to BIA because of an alleged failure to provide further explanation when that additional explanation was never requested. *See Olympic Adhesives, Inc. v. United States,* 8 Fed. Cir. (T) 69, 79, 899 F.2d 1565, 1574 (1990). Commerce suggests that Mitsui should have made efforts apart from the questionnaires to explain how the invoices from Mitsui related to invoices to U.S. customers. However, 19 U.S.C. § 1677e(c) does not place that obligation on the submitter. To avoid the threat of 19 U.S.C. § 1677e(c), a submitter need only provide complete answers to the questions presented in an information request. The Court finds that Commerce's conclusion that Mitsui failed to provide an explanation of how invoices from Mitsui to Mitsui USA correspond to sales to Mitsui's U.S. customers does not support the resort to BIA.

As to the second deficiency, Mitsui asserts that it did provide U.S. selling prices for some periods. Mitsui admits that the first computer tape they submitted contained omissions, but only in the first two periods. Mitsui asserts that the omissions were corrected on a second tape. Commerce did not accept the second tape because it was submitted after the preliminary results were published. The alleged omissions in the third and fourth periods were merely errors in interpretation by Commerce because where multiple shipments were made under one contract, the customer and product were not repeated on the tape, thus, creating the appearance of a gap. *Plaintiffs Memorandum* at 42–43.

Despite Mitsui's claim to the contrary, Commerce maintains that a sample page contained in *Defendant's Confidential Appendix Exhibit 1 ("Exhibit 1")* reveals that Mitsui failed to provide requested information

for some III and IV period sales. Mitsui did not claim that fields containing a "dot" or "decimal points" were "ditto" marks until after the disclosure conference, and no such explanation accompanied the tape. Further, the computer tape was accompanied by instructions, which indicate that the code "IP" specifies those instances in which the quantity or amount has been included in a previous line. The instructions contain no statement that the "dots" are intended to have the same function as the code "IP."[6] Thus, Commerce asserts that the use of a "dot" in a subsequent observation could only have indicated to Commerce the absence of information. The "dots" could not represent to Commerce subsequent shipments against a multi-shipment order. *Defendant's Memorandum* at 51.

Mitsui asserts that Commerce's criticisms of its tape are wrong, and that it did explain that some identical information is not repeated in its May 31, 1988, submission. Mitsui's May 31st submissions make clear that there are, in fact, two instances where identical data is not repeated: (1) where multiple shipments are involved (explained in the May 31 explanation letter), and (2) where individual shipments are involved (explained in the field descriptions accompanying both the March 4th and May 31st computer tapes).

The example highlighted by Commerce to criticize the May 31st explanation regarding multiple shipment data, *Exhibit 1,* does not in fact involve shipment. Instead, the *Exhibit 1* example shows an instance where, in individual shipments, repeated data is noted by use of the "IP" symbol. The "IP" symbol was fully explained in the field descriptions provided with both the March 4th and May 31st computer tapes. *See Defendant's Confidential Appendix Exhibit 2.* In addition, the "dots" and "O's" appearing in the Purchase Quantity, FOB Amount, and CIF Amount Fields for the records Commerce highlighted, are each accompanied by IP in the corresponding "unit" fields exactly as explained in the instructions. *Plaintiff's Reply Memorandum* at 15.

The first time that any of these alleged deficiencies were identified for Mitsui was at the disclosure conference following the preliminary determination. At no time during the investigation did Commerce issue to Mitsui deficiency letters indicating problems with its responses. Commerce simply may not resort to BIA based on a practice of not accepting corrections after a certain date, when Commerce did not inform respondent of any deficiencies until after that date. *See Daewoo Electronics Co. Ltd. v. United States,* 13 CIT 253, 267, 712 F. Supp. 931, 945–946 (1989). The Court will not penalize Mitsui for Commerce's failure to understand Mitsui's reasonable instructions, especially when Commerce did not indicate any difficulty with those instructions or seek clarification of same. Commerce has failed to demonstrate how these submissions were

---

[6] *See Exhibit 2* included in the confidential appendix to *Defendants Memorandum* for a copy of pertinent excerpts from the instruction.

inadequate. The Court finds that Commerce's determination that U.S. selling prices were not provided is unsupported by substantial evidence.

As to the third deficiency, Mitsui argues that the language of the questionnaire implies that the requested date of payment information was optional, and that its omission is therefore not grounds to resort to BIA. The questionnaire requested the dates "if known." *Plaintiffs Memorandum,* at 45. Mitsui does not indicate that the dates were in fact not known. Given the notation "if known", Commerce cannot resort to BIA because Mitsui did not provide the dates it received payment from its U.S. customers. This rationale does not provide justification for resorting to BIA. Commerce's reliance on missing payment dates as the rationale to resort to BIA is unsupported by substantial evidence.

As to the fourth deficiency, that the tapes were untimely submitted, Mitsui provides a chronology. *Plaintiffs' Memorandum,* at 46–48. The salient points of the chronology are addressed in the "Background" section of this Opinion. Mitsui argues that the long delay in initiating the reviews, the consolidation of several periods into one review, and other procedures made the reviews unfair to Mitsui. *Id.* at 50–51. Mitsui notes that despite the extraordinary nature and the vast scope of Commerce's requests, it cooperated to the best of its abilities throughout the fact finding process.

Commerce does not dispute Mitsui's chronology, but maintains that from the outset Commerce requested information that Mitsui had not previously provided, and, that Mitsui did not comply with the requests in a timely fashion. Commerce details at some length what was sought in each request and what Mitsui failed to provide. *Defendants Memorandum* at 45–47 *(See* Particularly n.14 at 46).

Commerce maintains that Mitsui had a meaningful opportunity to respond since it was given until February 17, 1988 to comply. The fact that Mitsui cooperated with Commerce does not render the decision to use BIA unjustified. There is no requirement that Commerce find any wrongdoing on the part of a noncomplying respondent before Commerce can resort to the use of BIA. *See Rhone Poulenc v. United States,* 8 Fed. Cir. (T) 61, 67, 899 F.2d 1185, 1190 (1990). Resort to BIA is justified whether noncompliance is "due to refusal or inability." *See Olympic Adhesives, supra,* at 1574.

Additionally, Commerce claims that partial use of BIA here was not an option because of the nature of "middleman" dumping. Commerce was unable to tell from the information supplied whether or not and to what extent Mitsui was dumping from partial data. *Defendant's Memorandum* at 53.

Plaintiffs assert that the issues in this case come down to a question of fundamental fairness. Mitsui argues that it was not provided with a reasonable and meaningful opportunity to respond. Mitsui points out that in a normal review covering one immediately preceding year, a respondent is given 45 days to submit a questionnaire response, and often 15 additional days on request. *Plaintiffs' Reply Memorandum,* at 10. In

this case, Mitsui was given a total of 83 days to provide 5 years of information, some of which was almost 10 years old. *Id.* at 9. Commerce's refusal to grant an extension of time until March 4, 1988, under the circumstances, was unreasonable. *Id.* at 10. The fact that the March 4, 1988 response was inadequate does not justify the use of BIA, Mitsui continues, because plaintiffs did not receive any notice of deficiencies or an meaningful opportunity to correct them, and Mitsui subsequently corrected them on its own initiative on May 31, 1988. *Id.* at 11.

Whereas there is no law or regulation requiring deficiency letters, the parties must be given a reasonable and meaningful opportunity to participate in the review and provide complete responses. *See Daewoo, infra.* In extraordinary cases such as the one at bar, Commerce should have anticipated substantial difficulty in obtaining timely cogent information. A reasonable and meaningful opportunity would have included extensions of time proportional to the additional annual periods requested and some indication of whether the information submitted satisfied the criteria for Commerce's analysis. No party is as well placed as Commerce to know what information is required for the methodology it chooses in any particular review. This special knowledge imposes on Commerce an obligation to reasonably insure that the subject of the investigation is informed as to those requirements.

In *Daewoo Electronics Co. Ltd. v. United States,* 13 CIT 253, 712 F. Supp 931 (1989), this Court found that Commerce's procedure was the root cause of the absence or untimeliness of information. In that case, foreign manufacturers and exporters challenged Commerce's decision to use BIA to calculate certain adjustments in a administrative review which Commerce had decided to conduct on an expedited basis. According to Commerce, it was justified in using BIA because a computer tape from one of the respondents was untimely submitted and not in the right format. The tape had been submitted three weeks beyond the deadline and four weeks before the final determination and was not formatted properly. The Court ruled that under these circumstances, it could not uphold the use of BIA. The Court noted, "[i]n the process of expediting the administrative review * * * Commerce has curtailed normal procedural safeguards of this administrative review proceeding." *Daewoo,* 13 CIT at 267, 712 F. Supp. at 946. Further, the Court held that unusual procedures used by Commerce "failed to avail plaintiff of an opportunity to provide timely and complete responses * * *." *Daewoo,* 13 CIT at 267, 712 F. Supp. at 945. Finally, the Court remanded with orders that Commerce "provide plaintiffs with a meaningful opportunity to participate in the review." *Daewoo,* 13 CIT at 267, 712 F. Supp. at 946.

In this case, Commerce did not resort to BIA in order to insure compliance with its statutory deadlines, but attempted to complete this premature review within self-imposed deadlines adopted uniquely for the purposes of this review. The record reflects that plaintiffs attempted, in good faith, to cooperate in this extraordinary review. Moreover, the

record indicates that Commerce failed to provide clear instructions as to the methods of compiling the information. Before Commerce may find any non-compliance on the parties to the proceeding, there must be a clear and adequate communication requesting the information, which is absent in this case. *Daewoo,* 13 CIT at 266, 712 F. Supp. at 945. Mitsui was not given an reasonable or meaningful opportunity to revise its original submission, consequently, Commerce has failed to avail Mitsui of an opportunity to provide timely and complete responses.

Upon due consideration, the Court finds that Commerce did not apply reasonable procedures in its attempt to solicit and clarify information from Mitsui in this extraordinary review, spanning seven review periods, some of which dated back almost ten years. Accordingly, Commerce's determination to resort to BIA was not in accordance with law. Since the Court remands this matter to Commerce for consideration of the information submitted by Mitsui specified below, it is premature to rule on the actual antidumping duty rate chosen as BIA, which is also in dispute.

CONCLUSION

For the foregoing reasons, this case is remanded in part to the ITA. The Court finds that plaintiffs' March 4, and May 31, 1988 tapes of U.S. sales information for steel wire strand for prestressed concrete from Japan were improperly withheld from the administrative record. On remand, the ITA is ordered to reevaluate its findings in light of these additions. The ITA shall report its remand results to this Court within 90 days and include, therein, a discussion of the relevancy of these additions. The parties shall have 45 days to file comments on the ITA's remand results.