CEMEX, S.A., PLAINTIFF *v.* UNITED STATES, DEFENDANT, AND AD HOC COMMITTEE OF AZ-NM-TX-FL PRODUCERS OF GRAY PORTLAND CEMENT AND NATIONAL CEMENT CO. OF CALIFORNIA, DEFENDANT-INTERVENORS

Consolidated Court No. 93–10–00659

(Dated August 13, 1996)

*Manatt, Phelps & Phillips (Irwin P. Altschuler, David R. Amerine, Thomas P. Ondeck* and *Ronald M. Wisla)* for plaintiff.

*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Cynthia B. Schultz), Lucius B. Lau,* Attorney Advisor, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*King & Spalding (Joseph W. Dorn, Martin M. McNerney* and *Michael P. Mabile)* for defendant-intervenors.

OPINION

RESTANI, *Judge:* This matter is before the court following a remand order. *CEMEX, S.A. v. United States,* Slip Op. 95–72 (Ct. Int'l Trade Apr.

24, 1995) *("CEMEX I")*. The court ordered the International Trade Administration of the United States Department of Commerce ("Commerce") to (1) collect "difference in merchandise" ("difmer") data to determine whether sales of Type I cement are suitable for comparison to U.S. sales of Types II and V cement; (2) reconsider Commerce's rejection of Cemex, S.A.'s ("CEMEX") interest income data as untimely; (3) reconsider whether sales to C.L. Pharris ("Pharris") were made at arm's length; and (4) correct the dumping margin calculation to rectify inadvertent errors by Commerce. *Id.* at 31. The court also conditionally remanded three cost issues if Commerce continued to calculate foreign market value ("FMV") on the basis of constructed value. *Id.* Plaintiff objects to the remand determination, arguing that (1) Commerce's difmer adjustment to FMV was unsupported by substantial evidence; (2) Commerce's freight methodology failed to fully account for pre-sale and post-sale freight deductions claimed by CEMEX; and (3) Commerce applied an improper arm's length test to Pacific Coast Cement's ("PCC") sales to Pharris. Defendant-Intervenors also object to the remand determination, contending that (1) Commerce committed an error in the programming of CEMEX's U.S. sales database; (2) Commerce erred in its adjustments for freight expenses; (3) Commerce erroneously calculated the adjustment for home market value-added taxes; (4) Commerce should have calculated an antidumping duty assessment rate to permit Customs to fully account for the absolute amount of antidumping duties; (5) Commerce erroneously failed to convert the value-added tax ("VAT") paid on home market sales to the short ton equivalent before adding that amount to ESP; and (6) Commerce erred in calculating the ESP offset cap for selling expenses.

DISCUSSION

I. *Difmer Adjustment:*

In its remand determination, Commerce determined that Type I cement was "similar merchandise" suitable for comparison to U.S. sales of Type II and V cement. Redetermination on Remand (Feb. 1, 1996) ("Remand Results") at 6. Pursuant to the court's remand order, Commerce requested data concerning the appropriate difmer adjustment to permit the price-to-price comparisons. The statute requires that

> [i]n determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between United States price and the foreign market value * * * is wholly or partly due to * * * the fact that [non-identical] merchandise * * * is used in determining foreign market value, then due allowance shall be made therefor.

19 U.S.C. § 1677b(a)(4)(C) (1988). Commerce's implementing regulation provides that

> [i]n calculating foreign market value, the Secretary will make a reasonable allowance for differences in the physical characteristics of merchandise compared to the extent that the Secretary is satisfied

that the amount of any price differential is wholly or partly due to such difference.

19 C.F.R. § 353.57(a) (1992).

The regulation further provides that Commerce may consider cost of production differences or market value differences which relate to differences in physical characteristics. *Id.* § 353.57(b).

On three separate occasions, Commerce requested that CEMEX submit the necessary data to determine the appropriate difmer adjustment. On May 10, 1995, Commerce issued a questionnaire requesting, *inter alia,* that CEMEX (1) identify all physical differences between Types II and V cement sold in the United States and Type I cement sold in the home market, and (2) provide the total cost of manufacture ("TCOM") and variable cost of manufacture ("VCOM") for Types II and V cement, and the VCOM for Type I cement, noting that the VCOM "should include only those costs that are attributable to physical differences between the U.S. and home market items being compared." Def.-Ints.' Resp. to CEMEX's Comments, App. D at 2. Commerce also requested that CEMEX provide data quantifying the cost differences between the home market comparison merchandise and the U.S. merchandise, including (1) a list of the total materials and direct labor; (2) direct factory overhead cost differences for each comparison product; and (3) a "list of the components or assembly functions that account for these differences in costs, with a full explanation of each listed item." *Id.*

Cemex responded to Commerce's questionnaire on June 14, 1995. Although it claimed a favorable difmer adjustment in that submission, CEMEX failed to provide all of the data requested. Specifically, CEMEX failed to provide (1) the requested difmer information on Type V cement; (2) TCOM data for Type II and V cement; (3) the requested list of components or assembly functions that accounted for cost differences between the products; and (4) the requested source documents and worksheets supporting all of CEMEX's calculations. Further, no information was provided to establish that cost differences were attributable to the physical characteristics of the products. *Id.,* App. E.

On August 11, 1995, Commerce notified CEMEX of these deficiencies and again requested the necessary data. In addition, Commerce requested, *inter alia,* that CEMEX (1) explain the commercial significance of the differences in chemical composition of the three cement types, listing all variances in chemical requirements, and quantifying, with explanation, the precise effect each difference has upon the VCOM and TCOM; (2) explain in detail any production differences among the cement types that lead to differences in cost; and (3) explain why it allegedly cost more to produce Type I cement than Type II and V cement. *Id.,* App. F.

In its August 24, 1995 response, CEMEX again failed to provide all of the information requested by Commerce. Specifically, CEMEX failed to provide (1) the requested source documents for its reported cost data and production volume for Type I cement; (2) the requested explanation

and quantification of the precise effect that the differences in chemical composition have upon the VCOM and TCOM; (3) the requested explanation regarding whether production differences led to differences in cost among the three cement types; and (4) the requested fixed overhead and TCOM data for Type I cement. CEMEX also failed to provide data in response to Commerce's request for information supporting CEMEX's claim that Type I cement cost more to produce than Type II and V cement. Instead, CEMEX simply stated that the "primary difference in the cost per ton of different cement types reflects the varying [weighted-average] efficiencies of the producing plants." *Id.*, App. G, at 6–7.

On September 21, 1995, Commerce made its final request for the necessary difmer data. *Id.*, App. H. CEMEX again inadequately responded to the requests for relevant information. Specifically, CEMEX deleted certain line items in a table requesting plant-specific production cost data to support the weighted-average cost data CEMEX provided on August 24, 1995. A second table requesting the average actual chemical composition of the three cement types was not submitted by CEMEX. Finally, with regard to Commerce's request for information regarding the relative costs of producing Type I and Type II cement, CEMEX only stated that the reduced per-ton cost of production for Type II cement was due to the consolidation of Type II production. *Id.*, App. I.

Based on CEMEX's deficient submissions, Commerce resorted to best information available ("BIA") for the difmer adjustment. CEMEX challenges this determination, asserting it submitted all of the necessary data requested by Commerce and established the physical differences between the different cement types. CEMEX also asserts that it complied with Commerce's requests to account for the differences in the VCOM attributable to raw material costs, labor costs and variable overhead costs for the different cement types. These claims are refuted by the record. CEMEX repeatedly responded to Commerce's request for complete information with partial, incomplete data. Further, CEMEX failed to establish that the difference in variable costs was tied to the physical differences of the cement types.

CEMEX also contests Commerce's decision to deny a difmer adjustment based on differences in variable overhead costs due to plant efficiencies. CEMEX asserts that this decision is inconsistent with Commerce's rejection of CEMEX's claimed adjustment for excess capacity in the second administrative review, where CEMEX averaged all overhead costs over all of its production. Instead, Commerce required allocation of overhead expenses on a plant-specific basis. This court later affirmed this aspect of Commerce's final results. As indicated, CEMEX failed to demonstrate its entitlement to a difmer adjustment by tying the differences in variable costs to the physical differences of the cement types.

Finally, CEMEX contends that it adequately explained the inconsistency in the difference in production costs for Type I and Type II

cement. According to CEMEX, the consolidation of Type II cement during the second review period led to greater relative efficiency of production for Type II cement compared to Type I cement. Commerce, however, noted other evidence from the first administrative review, which was incorporated into the record of the second administrative review, contradicting CEMEX's explanation, such as affidavits indicating that physical differences in the cement types stem from differing raw material mixes, chemical compositions, and fineness. Type II production, as indicated by these earlier submissions, required additional chemical characteristics and additional grinding time to attain the necessary fineness, both of which increased its cost. In any event, CEMEX failed to supply the necessary information to substantiate its claims that increased plant efficiency supported a difmer adjustment in this case. The claimed adjustments were not tied to the actual physical differences in the three cement types. The court finds that Commerce's resort to BIA was justified by CEMEX's unwillingness or inability to fully comply with Commerce's requests for information. 19 U.S.C. § 1677e(c) (1988) (Commerce "shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available."); *N.A.R., S.p.A. v. United States,* 741 F. Supp. 936, 941 (Ct. Int'l Trade 1990) ("[I]f a party does not produce the information *as requested,* the ITA is entitled to invoke 19 U.S.C. § 1677e and use best information available.").

CEMEX also challenge's Commerce's selection of BIA. In the remand determination, Commerce determined that, because CEMEX otherwise cooperated in all other aspects of the review, a price-to-price comparison of home market sales of Type I cement and U.S. sales of Type II and V cement was appropriate, and BIA would be applied only to the missing difmer data. Thus, Commerce applied, "as an adverse assumption, a twenty percent upward difmer adjustment to FMV as best information available." Remand Results at 13.

CEMEX objects to the 20% upward difmer adjustment as "patently unreasonable." The use of a 20% difmer adjustment as BIA has been used in other cases. *See Tapered Roller Bearings, and Certain Components Thereof, from Japan,* 56 Fed. Reg. 26,054, 26,057 (Dep't Comm. 1991) (final results) (applying 20% difmer adjustment as BIA where respondent failed to provide cost data for similar U.S. models), *aff'd, Timken Co. v. United States,* 865 F. Supp. 850, 854 (Ct. Int'l Trade 1994). Commerce has broad discretion in its choice of BIA. *Allied-Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1191–92 (Fed. Cir. 1993). Twenty percent is the ceiling for this tier of BIA adjustment, as a difference of more than 20% would result in a finding of dissimilar merchandise unsuitable for price comparisons. As CEMEX did not provide complete information, it cannot demonstrate that the 20% adjustment is in error. Accordingly, the court finds that Commerce's selection of BIA was reasonable, and is supported by substantial evidence.

## II. *Freight Methodology:*

Because of cement's low value to weight ratio, freight expense adjustments to price is an important issue in all of the cement cases. In these circumstances Commerce may reasonably expect parties to provide great detail in support of the adjustment. For purposes of price comparison, Commerce adjusted for home market freight expenses, employing a methodology that has been sustained by the court. *Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States,* Slip Op. 95–91, at 5 (Ct. Int'l Trade May 15, 1995), *aff'd,* Slip Op. 95–1485, at 5–7 (Fed. Cir. Aug. 1, 1996). As United States price was based on the exporter's sales price, Commerce adjusted FMV for home market movement charges according to the circumstances of sale ("COS") provision, 19 U.S.C. § 1677b(a)(4)(B).[1] Using this provision, Commerce stated its methodology as follows:

> [W]e adjust only for direct selling expenses, which include post-sale movement expenses and, in some circumstances, pre-sale movement expenses. Specifically, we treat pre-sale movement expenses as direct expenses if those expenses are directly related to the home market sales of the merchandise under consideration. Additionally, under the ESP offset provision we adjust for any pre-sale movement charges found to be indirect selling expenses.
>
> In order to determine whether pre-sale movement expenses are direct, [Commerce] examines the respondent's pre-sale warehousing expenses, since the pre-sale movement charges incurred in positioning the merchandise at the warehouse are, for analytical purposes, linked to pre-sale warehousing expenses. If pre-sale warehousing constitutes an indirect expense, then, in the absence of contrary evidence, the expenses involved in positioning the merchandise in the warehouse should also be treated an indirect expense. We note that although pre-sale warehousing expenses in most cases have been found to be indirect expenses, these expenses may be deducted from FMV as a COS adjustment in a particular case if the respondent is able to demonstrate that the expenses are directly related to the sales under consideration.

Remand Results at 19–20 (citation omitted).

In the remand determination, Commerce determined that CEMEX classified its pre-sale warehousing expenses as indirect.[2] *Id.* at 20. Thus, Commerce determined, pre-sale movement charges should also be treated as an indirect expense. CEMEX did not present any substantial

---

[1] That provision provides, in relevant part, that Commerce may grant an adjustment to FMV

> if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value * * * is wholly or partly due to * * * other differences in circumstances of sale * * *.

19 U.S.C. § 1677b(a)(4)(B). Commerce's regulation provides·

> In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference. In general, the Secretary will limit allowances to those circumstances which bear a direct relationship to the sales compared.

19 C.F.R. § 353.56(a)(1).

[2] CEMEX did not report any post-sale warehousing expenses. Remand Results at 20.

evidence demonstrating that its pre-sale movement charges were directly related to sale.

CEMEX argues that Commerce's application of its methodology is improper. Specifically, CEMEX contends that it was improper for Commerce to base it analysis on whether CEMEX's pre-sale freight expenses were directly linked to specific home market sales, as pre-sales expenses varied with the amount sold and CEMEX proffered an allocation methodology attributing all pre-sale freight to home market sales of Type I cement. First, Commerce has not declared this to be a sufficient test for direct expense treatment. Because the court in *Torrington Co. v. United States*, 82 F.3d 1039, 1050 (Fed. Cir. 1996) (cited by CEMEX at oral argument), found post-sales expenses directly related to particular sales, and which varied with amount sold, to be direct expenses, it is inapposite. Second, this argument was specifically rejected by the court in the appeal from Commerce's remand determination in the first administrative review. *See Ad Hoc Comm.*, Slip Op. 95–91, at 5–6 (finding "no conflict with the statute or regulations in the application of [Commerce's] approach"). Third, the linkage to warehouse expenses was upheld in *Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*, Slip Op. 95–1485, at 5–7 (Fed. Cir. Aug. 1, 1996). Thus, CEMEX's argument is without merit.

As for post-sale freight expenses incurred by CEMEX, Commerce used the following methodology:

> Where the point of sale and the producing plant are the same, *and* CEMEX has demonstrated that it has limited its reported freight deduction to sales of Type I cement, (the home market sales the Court required that we include in our analysis), we have deducted all freight incurred on CIF sales, *i.e.*, all post-sale freight, as a direct selling expense.
>
> In those instances where the point of sale and the producing plant are different, if CEMEX has demonstrated that it has limited its reported freight deduction to sales of Type I cement *and* has been able to distinguish adequately between the pre-sale and post-sale components of its freight expenses, we have deducted the post-sale portion as a direct expense, and have treated the pre-sale portion as an indirect expense.
>
> In instances where CEMEX has been unable to provide a breakdown of the pre-sale and post-sale portions of its freight expenses, we have treated all freight costs as indirect expenses.
>
> Finally, if CEMEX has been unable to separate the freight expenses attributable to sales of Type I cement, or to provide an adequate allocation of total freight expenses to sales of Type I cement, we have treated inland freight as an indirect expense.

Remand Results at 22–23.

In the remand determination, CEMEX submitted claims for post-sale freight adjustments for 21 plants and 5 terminals. CEMEX contends that Commerce improperly denied post-sale freight adjustments for 16 of the plants and 3 of the terminals. For these facilities, CEMEX con-

tends that Commerce should have accepted CEMEX's post-sale freight claims as its "allocation methodology used the most specific accounting information available for those points of sale." Pl.'s Comments on Remand Results at 29. Commerce notes, however, that the allocation methodology would have included freight expenses incurred for Type II and Type V cement. As indicated, Commerce's methodology limited post-sale COS adjustments to those associated with sales of Type I cement, as these sales formed the basis of FMV. Further, home market sales of Type II and V cement were found to be outside the ordinary course of trade, because, *inter alia,* Types II and V cement were shipped during the review period over considerably greater distances compared with Type I cement.[3] Thus, Commerce properly rejected CEMEX's allocation methodology.

CEMEX's citation to cases approving of non-distortive allocation methodologies, even though expenses also covered non-subject merchandise, is unavailing. These cases approved of allocation methodologies that apportioned expenses incurred as a fixed percentage of sales, and, thus, were correlated directly with the subject merchandise, *Smith-Corona Group v. United States,* 713 F.2d 1568, 1580 (Fed. Cir. 1983), *cert. denied,* 465 U.S. 1022 (1984), or apportionment was found to be representative and non-distortive of transaction-specific data, *Oil Country Tubular Goods from Korea,* 60 Fed. Reg. 33,561, 33,563 (Dep't Comm. 1995) (final determ. of less than fair value ("LTFV") sales). These circumstances are not present here. The freight expenses varied from sale to sale, from customer to customer, and from product to product. Type II and V cement were found to be outside the ordinary course of trade because unusual freight distances incurred, thus likely distorting CEMEX's allocation methodology. Commerce properly denied adjustments for the plants and terminals where CEMEX was unable to separate freight expenses of Type I cement from those of Types II and V.

Defendant-Intervenors challenge Commerce's COS adjustment for CEMEX's post-sale movement expenses for three plants.[4] Commerce determined that freight expenses related to these plants were directly related to sales of Type I cement, as freight expenses were derived from only Type I cements.

Defendant-Intervenors argue that there is no evidence in the record indicating that CEMEX's allocated freight expense for these plants was limited to Type I cement sales. With respect to the Vallejo terminal, CEMEX admitted that the "freight factor was calculated on the basis of several cement types and was not limited to freight costs and shipping weights limited to Type I cement." CEMEX's Rebuttal Comments at 13

---

[3] *See Gray Portland Cement and Clinker from Mexico,* 58 Fed. Reg. 47,253, 47,255 (Dep't Comm. 1993) (final results).

[4] *In its original objections, defendant-intervenors challenged Commerce's adjustment to freight expenses from seven plants. In its reply brief, leave for the filing of which is hereby granted, defendant-intervenors amended their objection, challenging only three plants. According to defendant-intervenors, CEMEX did not claim significant post-sale freight with respect to the other four plants.*

n.2. Thus, in accordance with Commerce's methodology, the allocation methodology as to this plant was not viable.

As to the other two plants, Leon and San Luis Potosi, CEMEX admitted at oral argument that non-subject merchandise was shipped from these plants and its data is not limited to Type I sales.[5] Despite its claimed methodology of approving allocations based on Type I sales only, Commerce allowed an adjustment even though non-subject goods (but not Type II or V cement) were involved. On remand Commerce is to determine if the inclusion of this other non-subject data in the allocation was distortive.

Defendant-Intervenors also assert that Commerce erred in allowing an ESP offset adjustment for "indirect" freight expenses. The remand results provide that Commerce classified freight charges as indirect expenses in three instances: (1) for CEMEX's pre-sales freight charges; (2) where CEMEX was unable to segregate pre-sales freight from post-sales freight; and (3) where CEMEX was unable to provide an adequate allocation of freight to sales of Type I cement. Remand Results at 22–23. These expenses were then deducted from FMV pursuant to the ESP offset provision. *See* 19 C.F.R. 353.56(b)(2). Defendant-Intervenors challenge the determination asserting that CEMEX failed to report transaction-specific, customer-specific, or merchandise-specific freight expenses. Defendant-Intervenors further assert that CEMEX failed to show that the allocation methodologies were not distortive.

Commerce responds that the caselaw does not require CEMEX to report indirect expenses on a transaction-specific, customer-specific, or merchandise-specific basis. Indirect selling expenses are, by their nature, not attributable to specific sales; thus Commerce regularly accepts allocations of indirect expenses to sales of in-scope merchandise. *See, e.g, Fresh Cut Roses from Columbia,* 60 Fed. Reg. 6980, 7011 (Dep't Comm. 1996) (final determ. of LTFV sales).

Defendant-Intervenors further asserted at oral argument, that based on *Torrington,* 82 F.3d at 1051, the claimed freight adjustments are failed direct adjustments and failed direct expenses may not be given indirect expense treatment. That is the holding of *Torrington. Id.* Therefore, no *indirect* expense treatment is permissible for post-sales freight expenses which do not qualify for direct sales treatment, for example where the allocation is unacceptable because of mixed cement types. If such expenses do not qualify for direct expense treatment, the adjustment must be denied. Pre-sales freight expenses, because they are not related to particular sales, may receive indirect expense treatment, as long as the allocation methodology is not distortive. This adjustment must be reconsidered in light of *Torrington.* The court does not preclude Commerce from making appropriate direct or indirect freight adjustments on a fair BIA basis wherever that approach may be warranted.

---

[5] CEMEX did not address defendant-intervenors's contention that freight expenses from Leon may have included sales attributed to Leon, but shipped from other plants to the customers.

III. *Sales to Pharris:*

During the period of review, CEMEX made sales of cement through its California distributor, PCC, to Pharris, a California producer of ready-mixed concrete. The cement purchased by Pharris was further manufactured into concrete that Pharris sold to its customers. CEMEX acquired Pharris during the review period. For sales subsequent to CEMEX's acquisition of Pharris, Commerce based the calculation of U.S. price on sales of ready-mixed concrete by Pharris to its unrelated customers.

Where the first U.S. sale to an unrelated customer is of a further manufactured product, the statute directs Commerce to adjust the U.S. price by deducting the amount of

> any increased value, including additional material and labor, resulting from a process of manufacture * * * performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

19 U.S.C. § 1677a(e)(3) (1988). Commerce's regulations further provide that the amount of value added in the United States

> generally will [be] determine[d] from the cost of material, fabrication, and other expenses incurred in * * * production [of the further manufactured product.]

19 C.F.R. § 353.41(e)(3).

The question is whether additional profit should be calculated from costs or whether transfer prices should be used because of an unusual . fact pattern. In the remand determination, Commerce stated its "long-standing practice in calculating the value added by further processing in the United States is to use the costs of manufacture, and not the transfer prices between related parties in the United States." Remand Results at 14. The value added in the United States calculated by this methodology was then subtracted from the U.S. price.

Nonetheless, Commerce had requested a remand because Pharris had argued that its transfer prices were arm's length prices and did not change after Pharris was acquired. The court granted Commerce's request and ordered Commerce to determine whether the sales were at arm's length. Commerce followed the court's instructions and subsequently determined that PCC's sales to Pharris were not made at arm's length. *Id.* at 15. It used the test ordinarily applicable to home market sales.[6] CEMEX contests the arm's length test and argues that no arm's length test was necessary because the sales price of cement sold by PCC to Pharris did not change as a result of the change in relationship. Commerce rejected these claims as CEMEX did not allege that the arm's length test was distortive or that use of transfer prices would more accurately allocate the profit attributable to U.S. further processing than

---

[6] Commerce's regulation provides that to compute home market value, Commerce is to use sales to related parties only if prices are comparable to those for unrelated parties. 19 C.F.R. § 353.45(a).

does Commerce's standard practice. That practice has the additional advantage of avoiding an investigation of the pre-acquisition relations of PCC and Pharris. Commerce made an unnecessary remand request; its prior methodology was acceptable under the statute and regulations.

IV. *VAT Adjustment:*

Defendant-Intervenors challenge the methodology used by Commerce to adjust for value-added taxes imposed on home market sales but not on export sales to the United States. Defendant-Intervenors note that Commerce used the VAT methodology approved by the Federal Circuit in *Federal-Mogul Corp. v. United States,* 63 F.3d 1572 (Fed. Cir. 1995), which defendant-intervenors assert only achieved a tax-neutral result with respect to the calculation of the absolute dumping margin (the difference between foreign market value and U.S. price). The Federal Circuit did not address, defendant-intervenors argue, "the fact that Commerce's methodology does not achieve a tax-neutral result with respect to the dumping margin *percentage* (the difference between FMV and U.S. price, divided by U.S. price)." Def-Ints.' Reply Br. at 7.

The court in *National Steel Corp. v. United States,* Slip Op. 96–97, at 7–13 (Ct. Int'l Trade June 14, 1996), recently rejected this same argument in the context of estimated duties. In that case domestic producers challenged the application of the tax-neutral methodology approved in *Federal-Mogul* to the calculation of the weighted average dumping margin, which serves as the cash deposit rate. *Id.* at 8. The domestic producers asserted that the Commerce's methodology results in a consistent undercalculation of the duty deposit rates. Concluding that the statute did not mandate the precise manner for calculating the cash deposit rate, the court upheld Commerce's methodology as a reasonable interpretation of the statute. "[T]he inherent imprecision of estimating future cash deposit rates would grant Commerce substantial discretion" in the selection of its methodologies. *Id.* at 12.

VAT issues have plagued these cases for more than a decade. While this court was in agreement with the *Federal-Mogul* dissent, it must conclude that the *Federal-Mogul* majority understood how dumping margins are applied when it approved Commerce's prior methodology. If the majority did not take these practicalities into consideration, it is for it to say, not this court.[7] As in *National Steel,* the court will not direct a contrary result for purposes of estimation of duty deposits. *See also* discussion in the following section.

V. *Assessment Rate Methodology:*

Defendant-Intervenors also cast their VAT challenge in terms of the assessment rate methodology for the second review period, arguing that Customs' "normal methodology for assessing antidumping duties— multiplying the entered value by the dumping margin percentage—will

---

[7] The court notes that the government did not take a position in *Federal-Mogul's* appeal and, thus, did not provide any guidance to the appellate court on these issues.

not assess the full amount of CEMEX's dumping." Def-Ints.' Objections to Remand Results at 26. This issue was not addressed directly in *National Steel.*

The remand determination does not address this issue. In its brief Commerce had erroneously argued that defendant-intervenors had not raised this issue before it. At oral argument Commerce asked for a remand on this issue. The court has a difficult time believing Commerce has not yet figured out the ramifications of its choice of VAT methodology. If it truly did not consider these arguments, however, it was erroneous to reach a decision without doing so. Because the remand determination does not address the weighted average percentage arguments in any way, Commerce is to address this issue both in terms of estimated deposits and assessments, and choose an appropriate methodology.

## VI. *ESP Offset Cap for Selling Expenses:*

Defendant-Intervenors alleged that Commerce erroneously calculated the ESP offset cap to be applied to CEMEX's home market sales of cement. Specifically, defendant-Intervenors asserted that in calculating the ESP offset cap, Commerce included U.S. indirect selling expenses for concrete, not for cement. Commerce contends that defendant-intervenors are wrong. According to Commerce, "[n]o concrete indirect selling expenses formed part of the ESP cap." Def.'s Partial Opp'n to Objections at 35. Commerce also set forth an explanation of its formula. Defendant-Intervenors then set forth with specificity in a proposed reply the exact error it was complaining of. Defendant-Intervenors did not press this claim at oral argument, but indicated it would inform the court later of its views. It later submitted a letter indicating the claim was not abandoned and that it was relying on its reply brief. At oral argument leave had not been granted to file a reply brief and counsel's conduct led the court to believe that it was not pressing the arguments made in its reply, as it did not address them specifically. Thus, neither the court nor opposing counsel addressed themselves to the merits of the reply. Ad Hoc's argument should have been set forth with specificity in its original challenge. Even so, it might have been considered had it been pressed at oral argument. It now comes too late. Accordingly, Commerce's adjustment is upheld.

## VII. *Programming Error:*

Defendant-Intervenors urge the court to order correction of a programming error that inadvertently changed certain "FRTOUT" values to "O" in Commerce's remand results. After first opposing the correction, Commerce now wishes to amend this clerical error. CEMEX responds that the computer error existed prior to the remand order; thus, defendant-intervenors' claim is untimely. Generally, the court will reject claims regarding inadvertent programming errors where the error was committed during the underlying review but not complained

of until Commerce completes its remand. *See Ad Hoc Comm.,* Slip Op. 95–91, at 11.

Defendant-Intervenors assert, however, that the error did not exist in the underlying review, and that they could not have known of the computer programming error prior to remand. Attached to its brief, defendant-intervenors include a portion of the computer program disclosed to it before appeal in this matter. According to defendant-intervenors, the computer program does not contain the error with respect to the deduction of the FRTOUT field in its entirety from ESP. Although not clear from defendant-intervenors's brief, the computer program does manifest an error indicating the incorrect FRTOUT amount was used. Defendant-Intervenors assert that the error likely came about from Commerce's downloading instructions when transferring CEMEX's sales tape to Commerce's computer system. These instructions were not disclosed to defendant-intervenors, and, thus, were undiscoverable. As indicated, however, the error did appear to exist in the computer program disclosed to the parties prior to the remand. Defendant-Intervenors proffered reason for not learning of the error from this data was that "counsel had no reason to suspect that FRTOUT charges had not been deducted from ESP." Def-Ints.' Reply Br. at 12 n.7. Were this the only claim for remand, the court might reject the request as untimely. Because Commerce seeks to correct the error, however, and remand is required for other reasons, the error may be corrected at this stage.

## VIII. *VAT Adjustment for Short Tons:*

Defendant-Intervenors assert that Commerce failed to convert the value-added tax paid on home market sales to the short-ton equivalent before adding that amount to FMV or United States price. Commerce agrees to correction of this error. Commerce is directed to correct this on remand.

### CONCLUSION

Remand results are due within 45 days hereof. The court deems this time sufficient for Commerce to consult with the parties and with the court if necessary. Commerce shall make freight expense adjustments in accordance with law, choose appropriate VAT methodologies, and correct the two clerical errors noted. The parties will be deemed to have no new objections to the recalculations unless the objections are filed within five days of filing of the remand results.